Dillard, Judge.
In Case No. A15A0828, Six Flags Over Georgia II, L.P. (“Six Flags”) appeals a jury verdict in favor of Joshua Martin, who sued Six Flags under a premises-liability theory after sustaining serious injuries when he was viciously attacked by gang members at a nearby bus stop that he used to access its park. On appeal, Six Flags argues that the jury’s verdict must be reversed because the attack on Martin occurred outside of its “premises and approaches” as defined in OCGA § 51-3-1, there was insufficient evidence to show that Six Flags’s negligence was the proximate cause of Martin’s injuries, and the trial court erred by denying its request to include some of Martin’s assailants on the verdict form for apportionment of fault. Martin cross-appeals, in Case No. A15A0829, arguing that the trial court erred by failing to give one of his requested jury instructions and by denying his request to enter judgment against Six Flags as of the verdict date, which deprived him of post-judgment interest. For the reasons set forth infra, we hold that the evidence was sufficient to support the jury’s verdict, but we nevertheless reverse the verdict and remand the case for a new trial because the trial court erred in denying Six Flags’s apportionment request. And because this case must be retried, we dismiss Martin’s cross-appeal as moot.
Viewing the evidence with every inference and presumption in favor of upholding the verdict,[1] the record shows that Six Flags is located in a well-known, high-crime area, which has been the site of numerous instances of criminal gang activity. Six Flags was aware of criminal gang activity within its park, and among its employees, but discouraged its employees from discussing the issue. Indeed, in the years preceding Martin’s attack, there had been instances of criminal activity inside the park that “spilled over” to outside the park. Eddie Herman, a former Cobb County police officer who worked closely with Six Flags for almost 30 years, testified that the risk of criminal activity was greatest at closing time when Six Flags’s customers were tunneled into parking lots and nearby bus stops, which he described as “hot spots.” Nevertheless, Six Flags invited its customers to use nearby bus stops, including the Cobb County Transit (“CCT”) bus stop, and considered the stops good for business.
*351 On July 3, 2007, a Tuesday, Martin went to Six Flags to celebrate a friend’s acceptance to college. Sometime that same day, unbeknownst to Martin, several gang members (who would later attack him), including at least one Six Flags employee, accosted and threatened two families inside the Six Flags park and in its parking lot. Specifically, approximately one hour before the park closed, the Tapp and Queen families were near a park ride, when gang members ran toward a five-year-old child. John Tapp grabbed one of the gang members to stop him from running over the child, and another gang member became angry and tried to strike Tapp from behind. When Eric Queen intervened, the gang circled Tapp and Queen, coming “nose to nose” with and threatening to “beat the shit out of” them. After Six Flags security guards approached, the gang members backed off and walked away. As they were walking away, the gang members threatened to “get” Queen and Tapp in the parking lot. Queen and Tapp reported the incident to Six Flags security, giving a physical description of the gang members.
At closing time, the Tapp and Queen families were leaving the park when they saw a group of approximately 40 men gathered around and looking toward the gate. The men were wearing similar clothing and included the same gang members who had earlier threatened them. After security guards followed the gang members out of the park gates and returned to the park, the Tapps and Queens exited the gates, believing it was safe for them to do so. Instead, they immediately saw the gang of 40 to 50 men blocking the sidewalk. And unable to return to the park, the Tapps and Queens tried to blend in with the crowd to avoid being noticed by the gang members who had threatened them. The two families were nonetheless spotted and someone yelled, “drop the hammer,” which Tapp understood to mean that the group had a gun. The Tapp and Queen families hurried to their cars and were able to escape without incident.
Shortly before 9:00 p.m., the park’s closing time, Martin, along with friends, walked down Six Flags Parkway to South Service Road past the CCT bus stop and then down South Service Road to a nearby hotel to use the restroom. But by the time Martin and his friends returned to the bus stop, they had missed the 9:00 p.m. bus. To wait for the next bus, Martin and his friends walked back down Six Flags Parkway toward the park and sat on a rail near the park entrance.
After seeing a large group of people in the area (all wearing similar t-shirts), Martin and his friends left the rail and walked away from the park back down Six Flags Parkway to the CCT bus stop where they waited for the bus. At this point, the group of gang members, including those that had accosted the Tapp and Queen families, turned their sights on Martin and his friends. Without any *352 provocation, Martin was hit with brass knuckles and knocked to the ground. Martin attempted to escape, but he was repeatedly stomped on by various gang members, which caused him permanent and severe brain damage.
Thereafter, Martin sued Six Flags under a premises-liability theory, alleging that it was liable for his injuries under OCGA § 51-3-1 for failing to exercise ordinary care to keep the park premises and approaches safe for him as its invitee. After a trial, the jury issued a verdict in favor of Martin and awarded him $35,000,000 in damages. And because the jury apportioned 8 percent of the fault to the four individuals who had criminal convictions related to Martin’s attack and 92 percent to Six Flags, the trial court entered judgment against Six Flags in the amount of $32,200,000, plus $541,093.12 for prejudgment interest, as well as court costs and post-judgment interest. This appeal by Six Flags follows.
At the outset, we note that when a jury returns a verdict and it has the approval of the trial judge, “the same must be affirmed on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence.”[2] Indeed, we are charged with construing “the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even [when] the evidence is in conflict.”[3] Bearing these guiding principles in mind, we turn now to Six Flags’s specific claims of error.
1. Six Flags first argues that the jury’s verdict was unsupported by the evidence because the bus stop where Martin was attacked was not, as a matter of law, part of its “premises and approaches” within the meaning of OCGA § 51-3-1. We disagree.
Our analysis necessarily begins with the text of OCGA § 51-3-1, which provides that when “an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe.” And our Supreme Court has interpreted this statutory text as imposing “a duty on a landowner regarding approaches to his premises that are public ways to exercise due care within the limited confines of his right in the public way, notwithstanding the landowner’s lack of control over that public way *353 approach.”[4] Furthermore, the term “approaches,” as used in OCGA § 51-3-1, has been construed to mean
that property directly contiguous, adjacent to, and touching those entryways to premises under the control of an owner or occupier of land, through which the owner or occupier, by express or implied invitation, has induced or led others to come upon his premises for any lawful purpose, and through which such owner or occupier could foresee a reasonable invitee would find it necessary or convenient to traverse while entering or exiting in the course of the business for which the invitation was extended.[5]
And property that is “contiguous, adjacent to, and touching” means “property within the last few steps taken by invitees, as opposed to ‘mere pedestrians,’ as they enter or exit the premises.”[6] Finally, what constitutes an approach to certain premises is “a question with both factual and legal connotations.”[7]
Here, the evidence shows that the attack on Martin occurred at the CCT bus stop, which is located at the intersection of two public streets — Six Flags Parkway and South Service Road — in an area that is not “contiguous, adjacent to, or touching” Six Flags’s premises. As a result, the CCT bus stop does not meet the Supreme Court of Georgia’s general definition of an “approach,” as outlined supra. Nevertheless, our Supreme Court has recognized that there are exceptions to this general definition of an approach.[8] Indeed, under certain circumstances “non-contiguous property can be deemed an approach because the landowner extended the approach to his premises by some positive action on his part, such as constructing a sidewalk, ramp, or other direct approach.”[9] And this exception is *354 premised on the fact that “the owner or occupier of land, for his own particular benefit, has affirmatively exerted control over a public way or another’s property.”[10]
In the case sub judice, there was evidence that public transportation has not always serviced Six Flags, and that it was “good for business” when the CCT bus stop and a MARTA station were finally able to service the theme park’s customers and employees. Indeed, Six Flags expressly invited its customers, via its website, to use the CCT buses, and the park constructed barricades and erected signs directing its customers along Six Flags Parkway leading to the CCT bus stop. In addition, Six Flags sent its own security staff, and even employed off-duty Cobb County officers, to aid on-duty Cobb County police in directing traffic in the public ways leading to the park. There was also evidence that these affirmative actions by Six Flags to exert control over the public way between the park and the CCT bus stop were solely for Six Flags’s benefit.[11]
Specifically, a Six Flags representative testified as follows:
Q. And there’s no other business to go to. Once you get to South Service Road, if you’re going anywhere, you’re going into the park; right?
A. Yes.
Q. From as far back as you can remember, Six Flags has been using this corridor as its final approach to the park; correct?
A. Well, that’s because ... the MARTA bus and the CCT bus are located there.
Q. Right. So when people get off the bus, this is the final approach to the park; right?
A. Yes.
Q. When folks come out of here and approach the park, they’ve got nowhere else to go but the park; right?
A. That’s correct.
*355 Q. And ... for years Six Flags has been taking care of that stretch of roadway, sidewalk, curb, all that area; right?
A. Yes.[12]
While the determination of whether certain property constitutes an “approach” within the meaning of OCGA § 51-3-1 is a question of law and fact,[13] a review of Georgia’s case law on this issue shows that making such a determination often heavily depends on the unique facts and circumstances of each individual case. Indeed, we have previously acknowledged that ascertaining exactly what constitutes an “approach” can be “complex and bothersome” and difficult to define;[14] and this case only serves to reinforce our prior sentiments about this thorny aspect of our jurisprudence.
The dissent concludes that the CCT bus stop is not an approach to Six Flags’s property as a matter of law because, even assuming there was evidence that Six Flags
took positive action to exercise rights to control pedestrian and vehicular traffic in those public ways and to physically maintain those public ways as an approach to the park, this is not evidence that Six Flags had or exercised any right to control security against a criminal attack in those public ways.
However, the dissent points to no evidence that Six Flags lacked a right to work with Cobb County to provide security for that area, and it acknowledges that there was evidence that the Six Flags’s security team and other employees worked with Cobb County police in at least some respects in that particular area — such as directing traffic and pedestrians as they traveled between the park’s entrance and the areas where the MARTA station and CCT bus stop were located.
And regardless, there was evidence that Cobb County police not only allowed, but even requested that Six Flags provide security in the area surrounding the CCT bus stop. As previously noted, Officer Herman, who had worked with Six Flags for years, testified that the risk of criminal activity was greatest at closing time when Six Flags’s *356 customers were tunneled into parking lots and nearby bus stops, which he described as “hot spots.” And even though Officer Herman repeatedly advised Six Flags to provide security in these “hot spots” during all operating hours, Six Flags declined to do so on weekdays, citing budgetary restrictions. It can be reasonably inferred from this testimony, then, that Six Flags could afford to and did provide security in those “hot spot” areas at least on the weekend.
As further evidence of Six Flags’s ability to control the area where Martin was attacked, another Six Flags representative testified that the park “had liberties over there since ... 1967” and that it had “never really been an issue as far as having to go to the county and file a sign permit or any of those type of issues.” The dissent brushes this testimony aside, emphasizing that Cobb County, not Six Flags, had the duty to provide police protection in the public way where the attack occurred. Similarly, Six Flags asserts that, regardless of whether certain off-duty officers on Six Flags’s payroll also patrolled the area, undisputed evidence shows that on-duty Cobb County police regularly patrolled the area and MARTA police had a regular presence near the bus stop where Martin was attacked. But Cobb County’s duty to provide police protection in this public way in no way precludes a jury from finding that Six Flags, nevertheless, exercised control over the same property for its own benefit. Indeed, we have previously held that whether an owner and a nonowner both controlled the owner’s property is a factual question for the jury.[15] To hold otherwise would render the exception to the general definition of an approach — i.e., extending an approach by exerting control over the property of another — utterly meaningless. Suffice it to say, this is something we may not do.[16]
Instead, we are duty bound to follow the well-established precedent of both this Court and our Supreme Court in this particular area of our jurisprudence. And the most analogous application of the exception to the general definition of an approach is in Combs v. Atlanta Auto Auction, Inc.,[17] where this Court noted that, although *357 the proximity to the owner’s property is perhaps the most important circumstance in determining what constitutes an approach to that property, it is “[a]lso important . . . whether the alleged approach, although part of a public way, is used primarily or exclusively by those attempting to access the landowner’s premises (i.e., whether the approach is used primarily by invitees of the landowner as opposed to the public at large).”[18] In addition, this Court considers “what kinds of rights the property owner has in the public way, including whether he has appropriated it for his own benefit”[19] and whether the property owner “induced or led” its patrons to use the area.[20]
In Combs, two children were tragically killed when a train hit their car on a railroad crossing approximately 25 feet from the defendant’s commercial property, and the children’s mother sued the property owner under a premises-liability theory.[21] The accident occurred on a short, unimproved road that serviced only the defendant’s business, and it appeared that “the road’s sole function [was] to facilitate the business operations of [the defendant].”[22] Furthermore, the property owner admittedly used the road as a “receiving area — i.e., for purposes other than as a public roadway.”[23] In addition, although there was an alternative entrance to the business, the plaintiff was instructed to use the road with the railroad crossing, which demonstrated that the property owner “clearly induced or led” her to use a particular entrance and made it reasonably foreseeable that she would find it necessary to cross the railroad tracks to access the property.[24] Under these particular circumstances, we held that, at the very least, the portion of the road where the railroad crossing was located constituted a final approach to that property.[25]
Here, as in Combs, Martin sustained his injuries in an area that exclusively serviced Six Flags and was used as a “receiving area” for *358 its customers — a purpose other than servicing the public at large.[26] Furthermore, because Six Flags expressly invited its customers to use the CCT buses, it could “foresee a reasonable invitee would find it necessary or convenient to traverse [the bus stop] while entering or exiting in the course of the business for which the invitation was extended.”[27]
In reaching a contrary conclusion, the dissent relies solely upon the Supreme Court of Georgia’s decisions in Motel Properties, Inc. v. Miller[28], and Todd v.F.W. Woolworth Company [29] But these cases are readily distinguishable. In Motel Properties, our Supreme Court held that “rip-rap,”[30] which was government property installed along the beach approximately 196 feet away from the motel’s premises and 27 feet past the end of a sidewalk leading to the motel, was not an approach to the motel when it was undisputed that the motel exercised no positive control over it.[31] In fact, unlike this case, there was no evidence that the motel took any positive actions to exert control over the rip-rap or that the area was used exclusively by its patrons *359 solely for its benefit. And in Todd, our Supreme Court did not even reach the question of what constitutes an approach because the plaintiff was injured in an area that was “admittedly” an approach to the premises.[32] Thus, in Todd, the Court merely held that whether the property owner’s negligence caused the plaintiff’s injuries was a question for the jury.[33]
That said, it is perfectly understandable that neither the dissent nor Six Flags analogize this case to any similar Georgia premises-liability cases to support the conclusion that the CCT bus stop was not an approach as a matter of law. Because, unlike cases involving a single grocery store, restaurant, or motel, Six Flags is a 290-acre theme park with a high volume of patrons entering and exiting its premises (10,000 on a slow day), many of whom gain access to the park by using mass transit stations that service only Six Flags. And while this type of premises-liability case is unique in Georgia, it is worth noting that other jurisdictions have determined that certain areas that are not adjacent to the property owner’s premises can nevertheless constitute an approach to the premises when the owner has reason to know that its customers routinely use those areas to access the premises.[34]
In sum, under the unique facts of this case (and viewing the evidence in the light most favorable to the jury’s verdict), a reasonable jury could have found that the CCT bus stop was an approach to *360 Six Flags’s premises within the meaning of OCGA § 51-3-1 because Six Flags took positive steps to exert control over that area, invited its customers to use the bus stop, and appropriated the bus stop solely for its benefit.[36]
2. Next, Six Flags argues that the jury’s verdict must be reversed because the evidence was insufficient to prove causation. Again, we disagree.
(a) Six Flags first argues that it cannot be liable for an “unexpected random criminal act,” which was the proximate cause of Martin’s injuries.
As this Court has previously explained, “[ajlthough a landowner has a duty to invitees to exercise ordinary care to keep its premises safe . . . , the landowner is not an insurer of an invitee’s safety.”[36] Generally, an intervening criminal act by a third party “insulates a landowner from liability unless such criminal act was reasonably foreseeable.”[37] And in order for the crime at issue to be foreseeable, “it must be substantially similar to previous criminal activities occurring on or near the premises such that a reasonable person would take ordinary precautions to protect invitees from the risk posed by the criminal activity.”[38] Furthermore, in determining whether prior criminal acts are substantially similar to the occurrence causing harm, thereby establishing the foreseeability of risk,
the court must inquire into the location, nature and extent of the prior criminal activities and their likeness, proximity or *361 other relationship to the crime in question. While the prior criminal activity must be substantially similar to the particular crime in question, that does not mean identical. What is required is that the prior incident be sufficient to attract the landowner’s attention to the dangerous condition which resulted in the litigated incident.[39]
Finally, it is important to keep in mind that “the question ‘of reasonable foreseeability’ of a criminal attack is generally for a jury’s determination rather than summary adjudication by the courts.”[40]
Here, there was overwhelming evidence that Six Flags was well aware of the dangerous conditions in and around its theme park that resulted in Martin’s brutal attack. Specifically, in the years prior to the vicious attack on Martin, there had been other criminal attacks that began inside the park and “spilled over” to areas surrounding the park. For example, approximately one year before the incident in this case, a gang fight began inside the park and continued outside of the park’s gates. This fight escalated to the point where shots were fired in Six Flags’s parking lot, which resulted in several injuries. And following this incident, Six Flags asked police not to release any information that would undermine its efforts to promote the park as having a “safe, family atmosphere.”
As detailed more fully supra, on the day of Martin’s brutal attack, several of his assailants, including at least one Six Flags employee, accosted and threatened two families inside the park. Specifically, gang members threatened to “beat the shit out of [them]” and “get” them in the parking lot. The families reported the incident to Six Flags security and gave a physical description of the gang members, but Six Flags inexplicably allowed the gang members to remain in the park. Six Flags asserts that “a combination of verbal abuse, gang garb, and rowdy conduct” is not enough to create a jury question as to foreseeability. But Six Flags — in addition to being on notice of the foregoing altercation on the day of Martin’s attack — was also keenly aware of other criminal activity in and around the park, including gang activity. Indeed, there was evidence that Six Flags knew that (1) the park was located in a high-crime area, (2) the bus stops and parking lots were especially dangerous, (3) the risk of violence increased at closing time, (4) it employed gang members, *362 (5) gangs can be violent, and (6) altercations inside the park had the potential to create “spillover violence” outside the park.[41] Additionally, there was testimony that the “majority of people that worked at Six Flags [were] in a gang.”
The dissent concludes that the vicious, unprovoked attack on Martin was not reasonably foreseeable because it “bore no likeness to any prior criminal activity in or near the park.” But as noted supra, Georgia law does not require prior criminal acts to be identical to the one at issue for it to be reasonably foreseeable.[42] Indeed, such a rigid approach to determining foreseeability is “not in keeping with either common sense or existing law.”[43] And for all of the foregoing reasons, the evidence supported the jury’s finding that it was reasonably foreseeable that someone could be attacked by gang members at the CCT bus stop, which Six Flags invited its customers to use.[44]
(b) Six Flags also argues that Martin’s “theory of causation” is too speculative. Specifically, Six Flags contends that Martin’s “laundry list” of the missed security measures resulting in his attack is too “speculative” to prove causation, as Martin presented no expert testimony on security-gang issues. But Six Flags provides no legal authority even remotely suggesting that a plaintiff cannot show causation in a premises-liability case without expert testimony. To the contrary, in Georgia, “[w]hat amounts to proximate cause is undeniably a jury question and is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy, and precedent.”[45]
*363 Here, there was evidence that Six Flags ignored Officer Herman’s advice to provide security near the CCT bus stop during all operating hours. In addition, the same gang members, including at least one Six Flags employee, threatened and terrorized two families earlier on the same day when they violently attacked Martin, and although Six Flags was aware of the incident, it refused to eject them from the park. And as discussed supra, Six Flags was keenly aware of the serious gang problem and criminal activity that occurred in and around its premises. Further, there appears to be no evidence of any efforts that Six Flags made to address these pressing issues. The foregoing evidence of causation, then, is specific and does not require speculation. Moreover, in numerous cases, we have “reiterated the principle that questions of negligence and causation, except in plain, palpable, and indisputable cases, are solely for jury determination.”[46] And the foregoing evidence simply renders this case not within the “indisputable” category.
3. Finally, Six Flags argues that the trial court erred in denying its request to include some of Martin’s assailants on the verdict form for apportionment of fault. We agree.
As a preliminary matter, Martin argues that Six Flags failed to adequately preserve its apportionment argument or has waived it on appeal. Under OCGA § 51-12-33 (d) (1), a defendant seeking to submit an apportionment issue to the jury must give notice no later than 120 days prior to the date of trial that a nonparty was either wholly or partially at fault.[47] And here, it is undisputed that Six Flags complied with the notice requirement. In its notice and supporting brief, Six Flags contended that numerous individuals involved in the attack on Martin should be included on the verdict form, including several unknown “John Does,” Brandon Forbes, Ander Cowart, Jonathan McCoy, Brian Gay, Nicholas Gay, David Miller, Kentavious Stevens, and Mark Davis. Moreover, during trial, there was some evidence that Cowart, Forbes, and a John Doe by the name of “Mr. Black” (all nonparties in the case) had some involvement in the vicious attack of Martin, and at the conclusion of trial, Six Flags requested that these individuals be included on the verdict form for apportionment of fault. Ultimately, the trial court denied Six Flags’s request, including only Six Flags and the four individuals with certified criminal convictions related to Martin’s attack on the verdict form.
*364 As noted supra, Six Flags referenced McCoy and several “John Does” in its pretrial apportionment notice, but it did not reference McCoy or any John Does other than “Mr. Black” when the trial court expressly asked Six Flags at the conclusion of trial who it wanted to include on the verdict form. Thus, Six Flags failed to preserve any argument that those parties should have been listed on the verdict form.[48] Nevertheless, Six Flags did seek to have Cowart, Forbes, and a “Mr. Black” included on the verdict form, and there is evidence in the record that these individuals were present and may have been involved in the attack.
Martin argues that, although Six Flags requested that these parties be added to the verdict form before the trial court, it has waived any challenge to the court’s apportionment ruling by failing to adequately brief the issue on appeal. But in its initial brief, Six Flags argued that the trial court erred in failing to include certain nonparties on the verdict form, “such as, McCoy and the John Doe defendants.” And “Mr. Black” was among those John Doe defendants. Moreover, in its reply brief, Six Flags expanded its argument in response to Martin’s claim that the apportionment issue had not been preserved. Specifically, Six Flags argued that the trial court erred in failing to include Cowart on the verdict form and cited to evidence of Cowart’s involvement in the attack. As a result, Six Flags has not waived its apportionment argument, at least as to Cowart and “a John Doe by the name of Mr. Black,” and thus, this Court may review its apportionment argument at least as to these two individuals.
Under OCGA § 51-12-33 (c), “[i]n assessing percentages of fault, the trier of fact shall consider the fault of all persons or entities who contributed to the alleged injury or damages, regardless of whether the person or entity was, or could have been, named as a party to the suit.”[49] This statutory scheme is designed to “apportion damages among all persons or entities who contributed to the alleged injury or damages — even persons who are not and could not be made parties to the lawsuit — a scheme that makes no sense if persons whose intentional acts that contributed to the damages are excluded.”[50] And, of course, it is a defendant’s burden to establish a rational basis for *365 apportioning fault to a nonparty; but whether the defendant meets that burden given the evidence at trial is an issue that should be left to the jury.[51]
Turning to the case at hand, at the close of trial, when Six Flags attempted to direct the trial court to evidence in support of its request to include Cowart, Forbes, and “Mr. Black,” on the verdict form, the court repeatedly interrupted Six Flags’s attorney by saying “no,” which essentially prevented it from arguing what evidence showed the involvement of these individuals in Martin’s attack. Furthermore, in denying Six Flags’s apportionment request, the court indicated that it would only consider including individuals who had a criminal conviction related to the attack or who personally testified to their involvement. The court even expressed reluctance to include one of the individuals who had a criminal conviction in connection with the attack on Martin because there was no evidence that the person physically touched Martin.
It is clear from the trial court’s statements in addressing the issue of apportionment that it misapplied well-established Georgia law, setting the bar far too high for determining who could be considered to have contributed to Martin’s injuries. Indeed, the Supreme Court of Georgia has held, in a premises-liability case, that a jury is even authorized to apportion fault between an unknown criminal actor and the property owner.[52] Furthermore, and contrary to the trial court’s suggestion, we have allowed juries to apportion fault to individuals who were present during a victim’s injury, but who did not physically touch or harm the victim.[53] In sum, because there was some evidence that Cowart and ‘Mr. Black” may have contributed to Martin’s injuries, the trial court erred by removing from the jury’s consideration the issue of whether those individuals should be apportioned fault.[54] As a result, the jury’s verdict must be reversed and the case remanded for a new trial.
*366 In her thoughtful concurrence, Judge Miller agrees that the trial court erred in denying Six Flags’s apportionment request, but she would remand the case for a trial solely on damages. But this Court has already held that an apportionment error entitles a defendant to a new trial. In Double View Ventures, LLC v. Polite,[55] this Court held that the trial court erred by refusing to allow the jury to consider whether a certain nonparty was partially at fault for injuries sustained by the victim during a shooting.[56] Specifically, this Court held that “[sjince there is some evidence showing that the [nonparty] may have contributed to [the victim’s] injuries, we [were] constrained to reverse the jury’s verdict because the jury did not have the opportunity to consider whether the [nonparty] should be apportioned fault.”[57] In doing so, we expressed our desire to honor the jury’s “substantial” verdict, but explained that it must be reversed due to the apportionment error.[58] Finally, in Division 3 of that opinion, we declined to address any challenges to the trial court’s evidentiary rulings that were “not likely to recur during retrial of the case . . . .”[59]
While we understand and appreciate the concerns expressed by Judge Miller in her special concurrence, we are unable to agree with her conclusion that Six Flags is only entitled to relitigate damages, when the defendant in Double View was entitled to a new trial. And while Judge Miller is correct that nothing in the text of OCGA § 51-12-33 mandates a new trial, it is likewise true that the statute does not authorize a different jury from the one who found liability to determine the respective fault of those involved. To the contrary, OCGA § 51-12-33 provides that when
an action is brought against more than one person for injury to person or property, the trier of fact, in its determination of the total amount of damages to be awarded, if any, shall... apportion its award of damages among the persons who are liable according to the percentage of fault of each person. . . .[60]
Thus, under the plain language of the statute, a jury may apportion fault only after hearing the evidence and determining whether any damages should be awarded at all.
*367 In concluding that Six Flags is entitled to a new trial, we fully recognize and “deplore the significant burden a retrial will impose, not only on the parties, but on the community as well,”[61] and we are concerned by the trial court’s error given the well-established precedent that Six Flags was entitled to have the requested individuals placed on the verdict form. Nevertheless, this Court must remain “steadfast in [its] commitment... to safeguarding the sacrosanct and cherished right to a fair and impartial jury trial,”[62] and that cannot happen unless trial courts abide by this Court and our Supreme Court’s clear guidelines on apportionment of fault.
In sum, although a reasonable jury could have found Six Flags to be liable under a premises-liability theory for Martin’s injuries, we are constrained to reverse the jury’s verdict and remand the case for a new trial as a result of the trial court’s error in failing to include the aforementioned individuals on the verdict form.[63]
For all of the foregoing reasons, in Case No. A15A0828, we reverse the jury’s verdict and remand the case for a new trial, and we dismiss Case No. A15A0829 as moot.

Judgment reversed and case remanded in Case No. A1SA0828.

Barnes, P. J., Boggs, Ray and Branch, JJ., concur. Miller, McFadden and McMillian, JJ., concur specially. Ellington, P. J., and Phipps, P. J., concur in judgment only. Doyle, C. J., and Andrews, P. J., dissent.

Appeal dismissed as moot in Case No. A15A0829.

Barnes, P. J., Ellington, P. J., Phipps, P. J., Miller, McFadden, Boggs, Ray, Branch and McMillian, JJ., concur. Doyle, C. J., and Andrews, P. J., dissent.

 Quay v. Heritage Fin., Inc., 274 Ga. App. 358, 363 (4) (617 SE2d 618) (2005) (punctuation omitted).

 Quay, 274 Ga. App. at 362 (4).

 Id. at 363 (4) (punctuation omitted).

 Motel Props., Inc. v. Miller, 263 Ga. 484, 485 (1) (436 SE2d 196) (1993), citing Todd v. F.W. Woolworth Co., 258 Ga. 194, 197 (1) (366 SE2d 674) (1988).

 Motel Props., Inc., 263 Ga. at 486 (2).

 Id. (citation and punctuation omitted).

 See Motel Props., Inc., 263 Ga. at 485 (1) (referring to “what physically constitutes an approach” as a “factual question”); Todd, 258 Ga. at 196 (1) (“What constitutes an approach to certain premises is a question with both factual and legal connotations.”); Combs v. Atlanta Auto Auction, Inc., 287 Ga. App. 9, 15 (4) (650 SE2d 709) (2007) (same).

 Motel Props., Inc., 263 Ga. at 486 (3).

 Id. (punctuation omitted); accord Rischack v. City of Perry, 223 Ga. App. 856, 858 (1) (479 SE2d 163) (1996); see Elmore of Embry Hills, Inc. v. Porcher, 124 Ga. App. 418, 420 (183 SE2d 923) (1971) (noting that a landowner might “extend the ‘approach’ to his premises beyond the limits thereof by some positive action on his part... and for his negligence in not keeping same in safe condition he would he liable”).

 Motel Props., Inc., 263 Ga. at 486 (3) (emphasis supplied).

 See id. (noting that the exception to the general definition of approach is “based on the fact that the owner or occupier of land, for his own particular benefit, has affirmatively exerted control over a public way or another’s property’ (emphasis supplied)); Combs, 287 Ga. App. at 15-16 (4) (noting that, in considering whether a public way constitutes an approach to a landowner’s property, “we consider what kinds of rights the property owner has in the public way, including whether he has appropriated it for his own benefit, using it for some purpose other than a public way” (emphasis supplied)).

 Although Six Flags argues that there was also evidence that the bus stop serviced nearby hotels, we must view the evidence in a light most favorable to the jury’s verdict. See supra footnotes 2-3 and accompanying text.

 See Motel Props., Inc., 263 Ga. at 485 (1) (referring to “what physically constitutes an approach” as a “factual question”); Todd, 258 Ga. at 196 (1) (“What constitutes an approach to certain premises is a question with both factual and legal connotations.”); Combs, 287 Ga. App. at 15 (4) (same).

 See Elmore of Embry Hills, Inc., 124 Ga. App. at 419.

 See Williams v. Nico Indus., Inc., 157 Ga. App. 814 (278 SE2d 677) (1981), disapproved of on other grounds by Malvarez v. Ga. Power Co., 250 Ga. 568 (300 SE2d 145) (1983) (holding that a “substantial fact issue” existed regarding whether the property owner or a general contractor or both were in control of the premises); see also Scheer v. Cliatt, 133 Ga. App. 702, 704 (2) (a) (212 SE2d 29) (1975) (noting that “[w]hether a particular appurtenance or instrumentality is under the control of an owner or occupant is usually a question of fact”).

 See Motel Props., Inc., 263 Ga. at 486 (3) (adopting the exception to the general definition of an approach under OCGA § 51-3-1); Whorton v. State, 321 Ga. App. 335, 339 (741 SE2d 653) (2013) (noting that “vertical stare decisis dictates that we faithfully adhere to the precedents established by the Supreme Court of Georgia . ..”).

 287 Ga. App. 9 (650 SE2d 709) (2007).

 Id. at 15 (4) (emphasis supplied).

 Id. at 15-16 (4) (emphasis supplied).

 Id. at 16 (4).

 See id. at 9.

 See id. at 9, 16 (4).

 Id. at 16 (4) (punctuation omitted).

 See id.

 See id.; see also Chambers v. Peacock Const. Co., 115 Ga. App. 670, 676 (3) (155 SE2d 704) (1967) (“An invitation may arise from known customary use, and it may be inferred from conduct or from any state of facts upon which it naturally and necessarily arises. Such an invitation may cover the right of an invitee to he protected by ordinary care not only upon such portions of the premises as may be necessary for mere ingress and egress, but upon those parts which are necessary or incidental to the mutual business or purposes of the invitation. Mutuality means that each party is lawfully interested and that there is a common interest or mutual advantage involved in the visit.” (citations omitted)).

 See Motel Props., Inc., 263 Ga. at 486 (2) (distinguishing the “last few steps” taken by invitees, as opposed to “mere pedestrians” as they enter or exit the premises). Cf. Harris v. Inn of Lake City, 285 Ga. App. 521, 523 (647 SE2d 277) (2007) (holding that wooden steps leading to a beach, which were installed and maintained by the County and which the general public had to use to access the beach, did not constitute an approach to a beach resort); Food Lion, Inc. v. Isaac, 261 Ga. App. 311, 312-13 (582 SE2d 476) (2003) (holding that the parking lot of a grocery store was not an “approach” to the store when it was “a common area of the shopping center where the store was located and was owned and maintained by [the store’s] landlord” (emphasis supplied)).

 Motel Props., Inc., 263 Ga. at 486 (2). Six Flags argues that Martin cannot succeed under a “control theory” because he has not shown that Six Flags exercised dominion or a continuing exclusive right to control the CCT bus stop area. But as explained supra, Georgia law does not require that a landowner exercise complete and exclusive control or dominion in order to extend the approaches to its premises. Indeed, in Motel Properties, our Supreme Court noted that, under certain circumstances, noncontiguous property can be deemed an approach merely by “some positive action on his part, such as constructing a sidewalk, ramp, or other direct approach.” Id. at 486 (3); accord Elmore of Embry Hills, Inc., 124 Ga. App. at 420. In support of its “control theory” argument, Six Flags refers us to Hous. Auth. of Atlanta v. Famble, 170 Ga. App. 509 (317 SE2d 853) (1984), but its reliance on Famble is misplaced. Unlike this case, Famble did not involve the exception to the general definition of an “approach,” whereby a landowner extends the approach to his property through some positive action or by appropriating it for his own benefit. See generally id. Instead, it addressed whether a landowner could be liable for injuries sustained on the primary premises (not an approach) when the property was in possession and control of another. See id. at 521 (2) (a) (“The liability of an owner of property, if any, is dependent on whether said owner had any duty which might arise from control of the property or title thereto or a superior right to possession of property which is in possession or control of another.” (punctuation omitted)).

 See supra footnote 4.

 See supra footnote 4.

 Rip-rap is a border of rock and concrete boulders placed along the shoreline to slow down the natural displacement of beach sand. See Motel Props., Inc., 263 Ga. at 484.

 See Motel Props., Inc., 263 Ga. at 486-87 (3) & (4).

 See Todd, 258 Ga. at 196-97 (1).

 See id. at 197 (1). The dissent also concludes that, in deciding this case, we must overrule our decision in Wilks v. Piggly Wiggly Southern, Inc., 207 Ga. App. 842 (429 SE2d 322) (1993), a case in which we held that a premises-liability claim under OCGA § 51-3-1 survived summary judgment even though the property owner “presented unrebutted evidence establishing that it was not the owner or in control of the area in which the appellant was attacked nor was it responsible for maintaining the lighting in the area.” Id. at 843. Regardless of the facts, circumstances, and holding in Piggly Wiggly, it is not relevant to this case because, as explained herein, the jury was authorized by the evidence to find that the CCT bus stop where Martin was attacked was an approach to Six Flags’s premises. As a result, we need not reconsider our ruling in Piggly Wiggly at this time.

 See, e.g., Ember v. B.F.D., Inc., 490 NE2d 764, 772 (1) (Ind. Ct. App. 1986) opinion modified on denial of reh’g, 521 NE2d 981 (Ind. Ct. App. 1988) (holding that a pub extended its duty of care beyond its premises to a parking lot across a public street when the record supported a reasonable inference that the pub knew its parking lot was insufficient for its patrons’ use and was aware its patrons customarily used the parking lot across the street while patronizing it); Warrington v. Bird, 204 N.J. Super. 611, 617 (499 A2d 1026) (App. Div. 1985) (“Commercial entrepreneurs know in providing the parking facility that their customers will travel a definite route to reach their premises. The benefitting proprietor should not be permitted to cause or ignore an unsafe condition in that route which it might reasonably remedy, whether the path leads along a sidewalk or across a roadway.”); see also Steinberg v. N. Ill. Tel. Co., 260 Ill. App. 538, 542 (Ill. Ct. App. 1931) (holding that when a landowner knows or has good reason to know that a particular means of ingress or egress from the premises is unsafe, the landowner should not invite his patrons to use it).

 See Motel Props., Inc., 263 Ga. at 486 (3) (noting that the exception to the general definition of approach is “based on the fact that the owner or occupier of land, for his own particular benefit, has affirmatively exerted control over a public way or another’s property” (emphasis supplied)); Combs, 287 Ga. App. at 16 (noting that, in considering whether a public way constitutes an approach to a landowner’s property, “we consider what kinds of rights the property owner has in the public way, including whether he has appropriated it for his own benefit, using it for some purpose other than a public way” (emphasis supplied)). We note that the dissent contends that Martin’s premises-liability claim fails for the additional reason that, at the time of the attack, he had left Six Flags’s premises to use the restroom at a nearby hotel and then returned to the park premises to wait on the bus “for his own convenience.” For this reason, the dissent concludes that, at the time when he was attacked, Martin was no longer an invitee of Six Flags. But because Six Flags has never argued that Martin lost his status as an invitee before he was attacked, it has waived that argument and this Court should not raise it suasponte on Six Flags’s behalf. See Ware v. Multibank 2009-1 RES ADC Venture, LLC, 327 Ga. App. 245, 251 (3) (758 SE2d 145) (2014) (holding that an argument is waived on appeal if it is not supported by cogent argument and citation to authority).

 Agnes Scott College v. Clark, 273 Ga. App. 619, 621 (1) (616 SE2d 468) (2005); accord Sipple v. Newman, 313 Ga. App. 688, 690 (722 SE2d 348) (2012).

 Agnes Scott College, 273 Ga. App. at 621 (1) (emphasis supplied); accord Walker v. Aderhold Props., Inc., 303 Ga. App. 710, 712 (1) (694 SE2d 119) (2010).

 Agnes Scott College, 273 Ga. App. at 621 (1); accord Sturbridge Partners, Ltd. v. Walker, 267 Ga. 785, 786 (482 SE2d 339) (1997).

 Agnes Scott College, 273 Ga. App. at 621-22 (1) (punctuation omitted) (emphasis supplied); accord Sturbridge Partners, Ltd., 267 Ga. at 786.

 Sturbridge Partners, 267 Ga. at 786 (punctuation omitted); accord Bethany Grp., LLC v. Grobman, 315 Ga. App. 298, 301 (1) (b) (727 SE2d 147) (2012).

 As previously noted, there was evidence that Cobb County police advised Six Flags to provide security near the CCT bus stop and MARTA station, but Six Flags declined to do so on weekdays due to budgetary restrictions. Such evidence supports a reasonable inference that Six Flags could afford to provide security on weekends. And we have previously held that “the voluntary undertaking to provide security on weekend nights could be construed by the jury to he evidence of foreseeability of criminal conduct.” Wade v. Findlay Mgmt., Inc., 253 Ga. App. 688, 690 (560 SE2d 283) (2002).

 See Sturbridge Partners, Ltd., 267 Ga. at 786; Agnes Scott College, 273 Ga. App. at 621-22 (1).

 Walker, 303 Ga. App. at 713 (1).

 See Sturbridge Partners, Ltd., 267 Ga. at 787 (holding that, because a landlord was aware of prior burglaries of vacant apartments, it was reasonably foreseeable that an unauthorized entry could occur when an apartment was occupied that resulted in a “brutal” rape); accord Bethany Grp., 315 Ga. App. at 301-02 (1) (b) (holding that a jury could find that the murder of a cab driver who had been called to an apartment complex was reasonably foreseeable when the apartment complex “had actual knowledge of the particular dangerous condition of serious crime in the area and on the premises and of the risks posed by dangerous characters involved in that type of activity”); Walker, 303 Ga. App. at 713 (1) (holding that prior property crimes were sufficient to make a subsequent sexual assault reasonably foreseeable to landlord).

 Reed v. Carolina Cas. Ins. Co., 327 Ga. App. 130, 132 (2) (762 SE2d 90) (2014) (punctuation omitted); see Zeagler v. Norfolk S. Ry. Co., 317 Ga. App. 302, 309 (3) (730 SE2d 657) (2012) (“Causation is traditionally a decision for the jury.”).

 Zeagler, 317 Ga. App. at 308 (2) (punctuation omitted) (emphasis supplied).

 Double View Ventures, LLC v. Polite, 326 Ga. App. 555, 561-62 (1) (b) (757 SE2d 172) (2014); accord Monitronics Int’l, Inc. v. Veasley, 323 Ga. App. 126, 136 (3) (746 SE2d 793) (2013).

 See Dempsey v. Gwinnett Hosp. Sys., Inc., 330 Ga. App. 469, 475 (765 SE2d 525) (2014) (“Inasmuch as we are a court for the correction of errors, we do not consider issues which were not raised below and ruled on by the trial court.” (punctuation omitted)).

 Emphasis supplied.

 Couch v. Red Roof Inns, Inc., 291 Ga. 359, 362 (1) (729 SE2d 378) (2012) (punctuation omitted); see Zaldivar v. Prickett, 297 Ga. 589, 593 (774 SE2d 688) (2015); see also Walker v. Tensor Mach. Ltd., 298 Ga. 297 (779 SE2d 651) (2015) (holding that a trier of fact may consider assigning fault to a nonparty employer that has immunity under the provisions of the Workers’ Compensation Act).

 Couch, 291 Ga. at 366 (1); Double View Ventures, LLC, 326 Ga. App. at 562 (1) (b).

 See GFI Mgmt. Servs., Inc. v. Medina, 291 Ga. 741, 741-43 (733 SE2d 329) (2012); see also Double View Ventures, LLC, 326 Ga. App. at 562 (1) (b) (noting that the apportionment statute does not require precise party identification).

 See Accor N. Am.., Inc. v. Todd, 318 Ga. App. 317, 318-19 (733 SE2d 846) (2012) (reversing the trial court’s finding that the jury could not consider apportioning fault related to a shooting to three criminal assailants, when only one of the assailants shot the victim).

 See Couch, 291 Ga. at 366 (1) (noting that whether the property owner can establish evidence to support any rational basis for apportionment is a question of fact for the jury); Double View Ventures, LLC, 326 Ga. App. at 562 (1) (b) (explaining that whether the defendants had met their burden of establishing a rational basis for apportioning fault to a nonparty should he left for the jury to determine).

 3 26 Ga. App. 555.

 See id. at 556, 560 (1) (a).

 Id. at 561 (1) (a) (emphasis supplied).

 See id.

 Id. at 564 (3) (emphasis supplied).

 OCGA § 51-12-33 (b).

 Guoth v. Hamilton, 273 Ga. App. 435, 440-41 (1) (615 SE2d 239) (2005).

 Harper v. Barge Air Conditioning, Inc., 313 Ga. App. 474, 479 (722 SE2d 84) (2011); see also Ga. Const. Art. I, Sec. I, Para. XI (a) (providing that the right to a jury trial “shall remain inviolate”); Jones v. Cloud, 119 Ga. App. 697, 706 (5) (168 SE2d 598) (1969) (holding that “an impartial jury is the corner-stone of the fairness of trial by jury”); Melson v. Dickson, 63 Ga. 682, 1879 WL 2629 (1879) (same); Morris S. Arnold, A Historical Inquiry into the Right to Trial by Jury in Complex Civil Litigation, in The Bill of Rights: Original Meaning and Current Understanding 399, 400 (Eugene W. Hickok, Jr. ed., 1993) (“That special affection for the jury ought to be viewed as relevant not just to the fact that jury trial was ‘preserved’ in the Constitution; it is relevant as well to interpreting the scope of the actual provision, for it gives the right granted an aura and the Constitution a meaning they would not otherwise have if the institution of jury trial had been regarded more or less indifferently.”).

 In cross-appeal Case No. A15A0829, Martin argues that the trial court erredby denying one of his requested jury instructions and by denying his request to enter judgment against Six Flags as of the verdict date, which deprived him of post-judgment interest. Because this case should be remanded for a new trial, Martin’s arguments in his cross-appeal are moot.