**THIRD DIVISION**
**MILLER, P. J.,**
**RAY and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. (Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008) http://www.gaappeals.us/rules/

**November 30, 2012**

# In the Court of Appeals of Georgia

A12A1343. MORDICA v. THE STATE.

RAY, Judge.

Following a hearing, the trial court granted the State's petition for forfeiture of $63,339 seized from Jeffrey Mordica's vehicle following a traffic stop. Mordica appeals, arguing that the State's complaint for forfeiture failed to comply with statutory pleading requirements, and that the trial court erred in admitting uncertified criminal records into evidence, in admitting a certain police officer as an expert in bulk drug and cash smuggling, and in finding that the funds were subject to forfeiture. Finding no error, we affirm.

Viewed with all inferences in favor of the trial court's findings, the record reveals that, on June 7, 2011, Officer Chris Webster of the Lamar County Sheriff's Office was patrolling interstate traffic, and upon noticing Mordica's car go by with

excessively tinted windows, he initiated a traffic stop of the vehicle. As he approached the vehicle, the officer noted that the car emitted the "[o]verwhelming odor of some type of air freshener." Using a window tint meter, the officer determined that the tint was 12%, in violation of Georgia law. Officer Webster asked Mordica for his license and insurance information and then, noting his Florida license plate, asked where he was going. Mordica responded that he was on his way to buy a restaurant in Atlanta, but that he couldn't remember the name of the restaurant. Upon further questioning, Mordica then clarified that he was intending only to lease the restaurant and that he had learned about the opportunity on the internet. During this conversation, the officer noticed that Mordica was demonstrating an "unusual level of nervousness" and that he could see Mordica's carotid artery "just pounding in his neck."

Based upon his conversation with Mordica, the officer "felt like [Mordica] was engaged in some type of criminal activity" and that "something wasn't right" with him. The officer then returned to his patrol car and ran Mordica's license. At this point, Officer Webster received a call for assistance from another officer located up the road in taking a federal fugitive into custody. Officer Webster then told Mordica that he would be issued a written warning, but asked Mordica to drive about 300

2

yards up the road so that Officer Webster could assist the other officer first. Mordica complied, and after assisting the other officer, Officer Webster instructed Mordica to step out of the car and asked if he had any contraband or large amounts of money in the vehicle. After Mordica responded that he did not, Officer Webster asked if he could search the vehicle. Mordica declined, and Officer Webster then informed him that he would be using the canine in his patrol car to do a free-air sniff. This resulted in a positive response for odor by the dog. At that point, Officer Webster detained Mordica, placed him in handcuffs, and again asked if there was anything suspect in the car. Mordica then told the officer that he had about $60,000 hidden in the car. Officer Webster then searched the car and found $63,339 in cash, divided into $1,000 bundles secured with rubber bands, as well as three cell phones.

Officer Webster asked Mordica about his finances, and Mordica replied that he had worked for a restaurant for the past two years and made about $500 a week, that he had received $6,700 from a legal settlement, and had recently taken out a $10,000 business loan. Officer Webster then ran a criminal report and found that appellant had a criminal history with several drug-related convictions.

It is undisputed that the police found no drugs in the car or on Mordica's person and that Mordica was not charged with any crime.

The State filed a forfeiture complaint against the $63,339 and served process on Mordica. Mordica answered and asserted a claim to the currency, which he contended was derived from lawful means, including the proceeds from his ownership in three businesses, and not from a violation of the Georgia Controlled Substances Act. After a hearing, the trial court entered an order granting the State's petition for forfeiture of the funds. Mordica appeals.

1. In several enumerations, Mordica contends that the trial court erred in finding that the funds seized from his vehicle were subject to forfeiture. Specifically, Mordica argues that following findings by the trial court were erroneous: that Officer Webster's request that Mordica drive up the road did not impermissibly extend the traffic stop, that the canine free-air sniff was conducted during a legal detention, and that the money found in Mordica's car was intended for use in a drug transaction.[1] Mordica filed a motion to suppress the contraband on these issues, which the trial

---

[1] Mordica additionally argues that the trial court's finding that the funds were derived from an illegal source was clearly erroneous because Mordica provided documents intending to show his involvement in legitimate business ventures. However, Mordica did not support this argument with any citation to legal authority. Accordingly, it has been deemed abandoned. See Court of Appeals Rule 25 (c) (2).

court treated as a motion in limine, and denied.[2] Finding that the trial court did not err, we affirm.

Under the Georgia Controlled Substances Act,[3] all property which is "directly or indirectly, used or intended for use in any manner to facilitate a violation . . . of the laws of the United States or any of the several states relating to controlled substances . . . or any proceeds derived or realized therefrom" is subject to forfeiture.[4] An action for forfeiture is a civil proceeding and "[t]he State, as plaintiff, was required to prove its case by a preponderance of the evidence rather than by the higher burden of proof applicable to criminal cases."[5] On appeal from an order of forfeiture, the trial court's findings of fact will not be reversed unless clearly erroneous, and due regard must be given to the trial court's opportunity to judge the credibility of the witnesses who appeared before it. This means that we will not disturb a trial court's findings if any

---

[2] Because a forfeiture proceeding is "quasi-criminal in nature, the exclusionary rule has been held to apply." *Pitts v. State*, 207 Ga. App. 606, 607 (1) (428 SE2d 650) (1993) (citation omitted). Accordingly, "if the search was illegal, it would render the evidence produced by the search tainted and inadmissible." Id.

[3] OCGA § 16-13-20, et seq.

[4] 16-13-49 (d) (2), (3)

[5] (Citations and punctuation omitted.) *Bettis v. State*, 228 Ga. App. 120, 121 (491 SE2d 155) (1997).

5

evidence exists to support them.[6] "This is true even where, as in the case sub judice, such findings are based upon circumstantial evidence and the reasonable inferences which flow therefrom."[7]

(a) Neither party disputes that Officer Webster was authorized to conduct a brief investigative traffic stop when he observed Mordica's illegally tinted windows.[8] Rather, Mordica argues that the traffic stop was impermissibly prolonged because although Officer Webster testified that it takes only two or three minutes to write a traffic warning under normal circumstances, Mordica's traffic stop was extended to about twenty minutes. We disagree.

It is well-settled that,

> [t]he investigative stop of a vehicle cannot be unreasonably prolonged beyond the time required to fulfill the purpose of the stop. . . . Once an officer's purpose for conducting a traffic stop has been fulfilled, the continued detention of the vehicle and its occupants is constitutional only if the officer has a reasonable articulable suspicion of other illegal

---

[6] Id.

[7] (Citation and punctuation omitted.) Id.

[8] *Wilson v. State*, __ Ga. App. __ (1) (Case No. A12A1156, decided on October 17, 2012) ("[A]n officer may conduct a brief investigative stop . . . if the officer observes a traffic violation") (punctuation and footnotes omitted). See OCGA § 40-8-73.1.

6

activity or when the valid traffic stop has de-escalated into a consensual encounter.[9]

Here, the trial court correctly concluded that the first delay in issuing the warning, when Officer Webster assisted another officer, was caused by exigent circumstances and did not constitute an unlawful detention. "We will defer to the trial court's determination that the prolongation of a detention was reasonable or unreasonable unless the facts are truly egregious."[10] While Officer Webster was running a license and warrant check,[11] he received a call from a nearby officer asking for assistance in taking a federal fugitive into custody. Officer Webster then asked Mordica if would consent to driving about 350 yards down the road so that the officer could provide the needed assistance before issuing the warning, and Mordica consented. Officer Webster had not yet issued the warning to Mordica at this time,

---

[9] (Footnote omitted.) *Wilson*, supra at (2). Accord *Salmeron v. State*, 280 Ga. 735, 736 (1) (632 SE2d 645) (2006).

[10] (Citation and punctuation omitted.) *State v. Long*, 301 Ga. App. 839, 841, n. 10 (689 SE2d 369) (2010).

[11] See *Harris v. State*, 269 Ga. App. 48, 50 (603 SE2d 476) (2004) ("an officer conducting a routine traffic stop may request and examine a driver's license and vehicle registration and run a computer check on the documents") (punctuation and footnote omitted).

7

and the time required for Officer Webster to assist the other officer was less than twenty minutes, as Officer Webster testified that the entirety of Mordica's traffic stop lasted only twenty minutes. In light of the totality of the circumstances, the trial court did not abuse its discretion in finding that Mordica's detention was not impermissibly prolonged by this first delay.[12]

Further, the trial court correctly concluded that the second delay in issuing the warning, when Officer Webster sought Mordica's consent to search the car and then used his drug dog was "justified by the reasonable articulable suspicion." After returning to the traffic stop, Officer Webster asked Mordica to step out of his car so that a warning could be issued. As discussed above, as soon as Officer Webster approached the vehicle, he noticed that the vehicle emitted a strong scent of air freshener, that Mordica exhibited unusual nervousness, and although Mordica explained that he was on his way from Tallahassee to Atlanta in order to purchase a restaurant, he could not remember the restaurant's name. Although "extreme nervousness alone does not constitute a valid reason for detention based on suspicion

---

[12] See *State v. Grant*, 195 Ga. App. 859, 863 (3) (394 SE2d 916) (1990) ("20-minute detention of an automobile driver did not exceed the bounds of an investigative stop").

8

of criminal activity,"[13] such behavior combined with the strong scent of air freshener and Mordica's strange explanation regarding the reason for his trip "constituted evidence on which the trial court could conclude that under the totality of the circumstances, [Webster] had a reasonable, articulable suspicion of criminal activity justifying a brief detention."[14]

Because of the above indicators and the fact that Mordica's nervousness did not diminish after learning that he was only to receive a warning, Officer Webster asked consent to search the vehicle and Mordica declined. Based upon the totality of the circumstances, Officer Webster was authorized to utilize his drug dog to conduct a free-air sniff at that time.[15] There was no wait as the officer had the dog in his vehicle. Moreover, the continued detention to perform the free-air search was

---

[13] (Citations omitted.) *Jones v. State*, 259 Ga. App. 849, 851 (578 SE2d 562) (2003).

[14] Id.

[15] See *Rowe v. State*, 314 Ga. App. 747, 752 (2) (b) (ii) (725 SE2d 861) (2012). Accord *State v. Whitt*, 277 Ga. App. 49, 51-53 (625 SE2d 418) (2005) (second detention reasonable where, inter alia, driver appeared to be nervous and did not know where he was going).

9

minimal given that the drug dog was already in the officer's patrol car.[16] Once the dog alerted on the outside of the car, Officer Webster had probable cause to believe that contraband would be found inside and was authorized to conduct a search.[17]

(b) Mordica asserts that the trial court erred in determining that the currency found in Mordica's vehicle was used or intended for use in a drug transaction. We disagree.

Although there were conflicts in the evidence presented at trial, the trial court was authorized by the evidence to find that the money seized from Mordica's vehicle was directly or indirectly used to facilitate the possession or sale of illegal controlled substances.[18] As stated above, this Court will not disturb a trial court's findings of fact if any evidence exists to support them, even if such findings are based wholly upon circumstantial evidence.[19]

---

[16] *Wilson*, supra at (2) (delay of ten minutes between traffic stop and sniff of the vehicle by a narcotic-detection dog was justified by reasonable suspicion of other illegal activity).

[17] *Jones v. State*, supra at 851 (1).

[18] See OCGA § 16-13-49 (d) (2), (3).

[19] *Bettis*, supra.

10

Citing only persuasive authority, Mordica argues that because no drugs were found in the car and no criminal charges were filed, the State's circumstantial evidence was insufficient to connect the funds to illegal activity. Although Mordica was not convicted of any crime and no drugs were found in the car, the following circumstantial evidence supports the trial court's determination that the money found in the car was connected to a violation of controlled substances laws: Lieutenant Chad Payne, who was admitted as an expert in drug and bulk cash smuggling, testified that bundling large amounts of cash in $1000 increments was common in drug transactions, there was testimony that it is common for someone engaged in drug trade to possess multiple cell phones, Officer Webster's drug dog gave a positive alert indicating that a controlled substance had recently been in the vehicle, Mordica had spent over twelve of the past twenty-five years incarcerated for drug-related offenses, and the trial court found that Mordica's explanations for how he obtained the funds and why they were in his car at the time of the traffic stop were not credible. Although we do not evaluate evidence, many courts have found that "a positive canine alert for narcotics on currency does not necessarily suggest that the money was involved in a drug transaction, as much of the currency in circulation contains

narcotics residue that a trained dog can detect,"[20] the drug dog's positive alert was not the only circumstantial evidence connecting the money to controlled substances.

2. Mordica argues that the State's complaint for forfeiture failed to comply with the statutory pleading requirements of OCGA § 16-13-49. Although Mordica raised this defense in his second amended answer, he did not seek, and the trial court did not provide, a ruling on this issue. It is well-settled that "this [C]ourt may not address issues on appeal which were not addressed by the trial court, because this [C]ourt is a court for the correction of errors and it does not consider matters which were not raised and ruled on by the trial court."[21] Without a ruling by the trial court on this particular issue, there is nothing for this Court to review upon appeal.

3. Mordica contends that the trial court erred in admitting Lieutenant Chad Payne as an expert in drug and cash smuggling, arguing that the State failed to lay a proper foundation required to qualify Payne as an expert because it failed elicit testimony from Payne about his training, experience, or expertise as to drugs or bulk cash smuggling. Although Mordica objected at the hearing to the trial court admitting

---

[20] (Citations omitted.) *Baker v. State*, 269 Ga. App. 722, 726, n. 20 (605 SE2d 126) (2004).

[21] (Citation and punctuation omitted.) *Morman-Johnson v. Hathaway*, 312 Ga. App. 300, 301 (1) (718 SE2d 132) (2011).

Lieutenant Payne as an expert, his objection was solely on the basis that although Lieutenant Payne "may be an expert, . . . he's also an active participant in this investigation." Because Mordica did not object to the admission of Lieutenant Payne as an expert on the same grounds he asserts on appeal, he has not preserved this issue for appeal.[22] Accordingly, this enumeration of error presents nothing for our review.

4. Mordica contends that the trial court erred in allowing the State's attorney to prove Mordica's prior convictions by a report provided by the Georgia Crime Information Center ("GCIC") when the report was neither certified nor introduced with a proper foundation. Finding that Mordica did not properly preserve this issue for appeal, we disagree.

We have determined that OCGA § 24-3-17 (b) "allows for the introduction of records obtained from any terminal lawfully connected to the GCIC, without the need for additional certification."[23] However, "a witness must lay the foundation for the

---

[22] *Wellons, Inc. v. Langboard, Inc.*, 315 Ga. App. 183, 186 (1) (726 SE2d 673) (2012).

[23] (Citation and punctuation omitted.) *Jackson v. State*, 228 Ga. App. 877, 877-878 (1) (492 SE2d 897) (1997).

13

admission of the [uncertified GCIC] printout" by stating that it was, indeed, pulled from a lawfully connected GCIC terminal before it can be admitted into evidence.[24]

At the hearing, Officer Webster testified that he utilized the GCIC database to determine that Mordica had a history of drug convictions beginning in 1984, and that he had spent more than twelve of the past twenty-five years in prison. The State then admitted the GCIC computer printout detailing those convictions into evidence. After Mordica's counsel objected to the admission of the GCIC printout, the State's counsel accurately stated the law that GCIC printouts are admissible "as long as the officer can state that he ran the history on a GCIC terminal here in Georgia." However, the State never elicited testimony from Officer Webster that he had, in fact, pulled the GCIC report from such a terminal.

Despite the absence of this testimony, Mordica objected to the admission of this GCIC printout solely on the basis that the State should have presented certified copies of the convictions from both Georgia and other jurisdictions. However, on appeal, Mordica now objects on the basis that the State failed to meet the foundational requirements of OCGA § 23-7-17 (b) because "the officer never testified

[24] (Footnote omitted.) *Smith v. State*, 247 Ga. App. 516, 517 (1) (544 SE2d 208) (2001). Accord *Worthy v. State*, 252 Ga. App. 852, 853 (1) (557 SE2d 448) (2001).

14

that the GCIC was pulled from a terminal lawfully connected to the GCIC." Mordica's failure to specifically object to lack of this foundational requirement at the hearing is fatal to this objection as he has not preserved the issue for us on appeal.[25]

*Judgment affirmed. Branch, J., concurs. Miller, P. J., concurs specially.*

---

[25] See *Worthy*, supra at 853 (1) (although defendant objected to the admission of the GCIC printouts at trial on the basis of "lack of foundation," this objection was not specific enough to allow the trial court to rule on the issue and preserve it for appeal because "'lack of foundation' has no single defined meaning, an objection of 'lack of foundation' generally is of little or no use to a trial judge") (punctuation and footnote omitted). Compare *Tipton v. State*, 213 Ga. App. 764, 765 (2) (445 SE2d 860) (1994) (conviction reversed because the State did not lay an adequate foundation for introduction of GCIC when prosecutor merely represented in his argument that the record was obtained from such a lawfully connected terminal and did not elicit the necessary testimony from the witness).

A12A1343. MORDICA v. THE STATE.

MILLER, Presiding Judge, concurring specially.

While I agree with the majority's final decision, I write separately in this forfeiture case because of concerns about the fairness of forfeiting an individual's money where no criminal charges were filed, no drugs were found, and the trial court's decision rested upon consideration of the individual's prior drug convictions. In Georgia, forfeiture cases typically involve the presence of some amount of drugs. Here, no drugs were present in the vehicle. Therefore, the link between the money and suspected illegal drug activity was attenuated and difficult to prove. See *Baker v. State*, 269 Ga. App. 722, 727 (605 SE2d 126) (2004).

I disagree with the majority that Mordica's prior convictions could be considered for the purpose of determining whether the money was connected to illegal drug activity. Evidence of prior bad acts is not admissible to show a propensity to commit criminal acts in general or a certain type of crime in particular. See OCGA

§ 24-2-2; see also *King v. State*, 230 Ga. App. 301, 303-304 (1) (496 SE2d 312) (1998).

Nevertheless, there is some evidence to support the trial court's finding in this case. Notably, Mordica was in possession of a large sum of money, which is strong evidence of narcotics trafficking.[1] See *United States v. $242,484 in United States Currency*, 389 F3d 1149, 1161 (IV) (B) (1) (11th Cir. 2004). Additionally, the fact that the currency was packaged in bundles wrapped with rubber bands is probative of a connection to illegal activity, given the law enforcement officer's testimony that, in his experience, individuals engaged in drug activity commonly package money in that manner. See *$242,484*, supra, 389 F3d at 1161-62 (IV) (B) (2) (noting that the manner of bundling a large amount of currency in rubber bands may be indicative of connection to drug activity). More importantly, the evidence showed that the drug dog alerted to the vehicle. Additionally, Mordica initially told the police officer that he did not have cash in the vehicle, but later confirmed that he did after the drug dog's alert. Mordica's inconsistent statements about the currency and the purpose of

---

[1]As in Georgia's forfeiture proceedings, the federal forfeiture law requires the federal government to prove by a preponderance of the evidence that the defendant's property is subject to forfeiture. See *United States v. $291,828 in United States Currency*, 536 F3d 1234, 1236-37 (11th Cir. 2008).

2

his trip, along with the drug dog's alert to the vehicle, were probative of possible illegal drug activity.[2] See id. 1164-1166 & n. 10 (IV) (B) (7) - (11) (observing that conflicting stories and a positive drug dog alert to currency are probative facts in determining whether the currency has a connection to illegal drug activity). Consequently, I agree with the majority that the evidence, although entirely circumstantial, was sufficient to support the trial court's finding that the currency was connected to illegal drug activity.

---

[2] In *Baker*, this Court noted that "a positive canine alert for narcotics on currency does not necessarily suggest that the money was involved in a drug transaction, as much of the currency in circulation contains narcotics residue that a trained dog can detect." (Citations omitted.) *Baker*, supra, 269 Ga. App. at 726, n. 20. To support this statement, the Court in *Baker* relied upon the Sixth Circuit Court of Appeals decision in *United States v. $5,000 in U.S. Currency*, 40 F3d 846, 849-50 (III) (6th Cir. 1994). More recently, however, the Sixth Circuit called into question this "currency contamination theory" and referred to newer research indicating that trained detection dogs likely "will alert to currency only if it has been exposed to large amounts of illicit cocaine within the very recent past." (Citation and punctuation omitted.) *United States v. Terry*, 522 F3d 645, 650, n. 5 (II) (6th Cir. 2008). The trial court was authorized to find that the drug dog's alert in this case was probative of whether the currency had a connection to illegal drug activity. See *$242,484*, supra, 389 F3d at 1166 (IV) (B) (2) (holding that without evidence supporting a "currency contamination theory," a drug dog's alert is a probative fact of a possible connection to illegal drug activity).