**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**October 6, 2020**

# In the Court of Appeals of Georgia

A20A1442. PNEUMO ABEX, LLC, et al. v. SHEILA LONG, et al.

DILLARD, Presiding Judge.

Pneumo Abex, LLC and Genuine Parts Company[1] appeal the trial court's partial grant of summary judgment to Sheila Long—individually and as personal representative of her late husband's estate[2]—in her toxic-tort action, alleging that Ron died from lung cancer as a result of exposure to asbestos contained in certain products. Long sought summary judgment on affirmative defenses that she anticipated the appellants might pursue. Now, the appellants argue that the trial court

---

[1] Honeywell International, Inc.—the successor in interest to the Bendix Corporation—also appealed from the trial court's order, but withdrew from the appeal after entering into a settlement with Sheila Long. Pneumo Abex, LLC and Genuine Parts Company are the only remaining appellants.

[2] For the sake of clarity, we refer to Sheila Long as "Long" and Ron Long as "Ron" throughout this opinion.

erred in granting summary judgment to Long as to their non-party fault defense and on "alternative carcinogens." For the reasons set forth *infra*, we affirm.

Viewing the evidence in the light most favorable to the appellants (*i.e.*, the nonmoving parties),[3] the record shows that from 1977 until 1999, Ron worked as a truck and automobile mechanic for various companies and then at his own automobile repair shop. During his career, Ron performed numerous brake, clutch, and gasket replacements; and some of the equipment and materials he used in the course of his work were manufactured by the appellants and contained asbestos. On November 11, 2014, Ron was diagnosed with pulmonary adenocarcinoma, a form of lung cancer. According to one of his treating physicians, Ron was exposed to asbestos in the

---

[3] *See*, *e.g.*, *Martin v. Herrington Mill, LP*, 316 Ga. App. 696, 696 (730 SE2d 164) (2012). The record before us consists of 14,478 pages contained in 54 volumes. And as we have previously noted, we will not "cull the record on behalf of a party, particularly in a case such as this where the record is voluminous." *Callaway v. Willard,* 351 Ga. App. 1, 5 (1) (830 SE2d 464) (2019); *see Harris v. State*, 256 Ga. App. 120, 122 (2) (567 SE2d 394) (2002) ("We have repeatedly held that it is not the function of this [C]ourt to cull the record on behalf of a party. This is particularly true in a case such as this where the transcript alone exceeds 1,500 pages." (footnote and punctuation omitted)). So, while it appears the parties' briefs and our independent review of the record have identified the portions of the record relevant to this appeal, we caution that "if we have missed something in the record or misconstrued an argument, the responsibility rests with [appellants'] counsel." *Cawthon v. State*, 350 Ga. App. 741, 743 (830 SE2d 270) (2019).

course of his work, and in the doctor's professional opinion, Ron's exposure to asbestos was "a substantial contributing factor in causing his lung cancer."

On September 16, 2016, prior to Ron's death, the Longs filed a negligence complaint against numerous defendants, alleging, *inter alia*, that Ron's lung cancer was a direct result of exposure to asbestos contained in their products.[4] Discovery ensued, and over a year later (after Ron died from his lung cancer), Long filed a motion to substitute herself—in her capacity as the executor of Ron's estate—in place of Ron as a plaintiff. Long also sought to file an amended complaint, which, *inter alia*, added a wrongful-death claim. The trial court granted both requests, and so, Long proceeded with the case in her individual capacity, as well as in her capacity as executor of Ron's estate.

Thereafter, several parties filed motions for summary judgment. But this appeal concerns Long's motion for partial summary judgment "regarding various affirmative defenses and alternative causation." Specifically, Long argued that, during discovery, the appellants attempted to "assign liability" for Ron's lung cancer to other causes, such as exposure to second-hand smoke, radon, or diesel exhaust (*i.e.*, "alternative

---

[4] The Longs also asserted claims for loss of consortium, products liability, and punitive damages, but those claims are not at issue in this appeal.

3

carcinogens"), but for purposes of apportionment, they failed to satisfy their burden of presenting any competent evidence that Ron was exposed to such alternative carcinogens. Furthermore, Long contended that she had "reason to believe" the appellants intended to assign liability for Ron's death to the alleged medical malpractice of his doctors, who are not parties to this case; but according to Long, there was no evidence that any such malpractice occurred. As a result, Long maintained that she was entitled to summary judgment as to these potential defenses, or, alternatively, the trial court should exclude any evidence related to them.

Following the appellants' response and Long's reply, which are discussed *infra*, the trial court ultimately granted Long's motion.[5] As to the issue of alternative carcinogens, the trial court found that no expert witness in the case—either for Long or the appellants—testified that exposure to second-hand smoke, diesel exhaust, or radon could have caused Ron's cancer, and certain arguments they made were inconsistent with the burden of proof required by the apportionment statute. Furthermore, the court found that the affidavit of the appellants' expert (Dr. Allan

[5] It is unclear whether the trial court held a hearing on Long's motion, and although Long references a hearing, she does not cite to a hearing transcript in the sizeable record. And the appellants make no reference to the hearing at all. Thus, it does not appear that a transcript from any potential summary-judgment hearing is necessary for our resolution of this appeal.

Feingold)—in which he detailed his opinion regarding the alleged medical malpractice of Ron's physicians—did not meet the required causation standard of expressing his opinion with "a reasonable degree of medical certainty." Regardless, the court also found that Feingold was not qualified to testify as an expert because he did not have the requisite experience as a practicing medical doctor in the area of concern. Lastly, the court found that any injuries resulting from improper or unskilled medical treatment by a physician were a foreseeable part of the damages resulting from Ron's lung cancer. This appeal from the trial court's partial grant of summary judgment in favor of Long follows.

Summary judgment is proper when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."[6] Furthermore, a *de novo* standard of review "applies to an appeal from a grant or denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant."[7] And at the summary-judgment stage, "[w]e do not resolve disputed facts, reconcile the issues, weigh the evidence, or determine its credibility, as those matters must be submitted to a jury for

---

[6] OCGA § 9-11-56 (c); *accord Martin*, 316 Ga. App. at 697.

[7] *Martin*, 316 Ga. App. at 697 (punctuation omitted).

5

resolution."[8] Nevertheless, if there is no evidence sufficient to "create a genuine issue as to any essential element of [the] plaintiff's claim, that claim tumbles like a house of cards[,]" and all other factual disputes are rendered immaterial.[9] With these guiding principles in mind, we now address the appellants' specific claims of error.

1. The appellants argue that the trial court erred in granting summary judgment to Long as to their "non[-]party fault defense" that Ron's treating physicians committed malpractice, which contributed to his "injuries or damages." We disagree.

Under OCGA § 51-12-33 (c), "in assessing percentages of fault, the trier of fact *shall consider* the fault of *all persons or entities* who contributed to the alleged injury or damages, regardless of whether the person or entity was, or could have been, named as a party to the suit."[10] Indeed, the statute is designed to apportion damages "among all persons or entities who contributed to the alleged injury or

---

[8] *Tookes v. Murray*, 297 Ga. App. 765, 766 (678 SE2d 209) (2009).

[9] *McQuaig v. Tarrant*, 269 Ga. App. 236, 237 (603 SE2d 751) (2004); *accord Dyess v. Brewton*, 284 Ga. 583, 586 (3) (669 SE2d 145) (2008).

[10] *Sw. Emergency Physicians, P.C. v. Quinney*, 347 Ga. App. 410, 421 (3) (819 SE2d 696) (2018), quoting OCGA § 51-12-33 (c).

6

damages—even persons who are not and could not be made parties to the lawsuit[.]"[11] But significantly, the fault of a non-party "cannot be considered for the purposes of apportioning damages without some competent evidence that the non[-]party in fact contributed to the alleged injury or damages."[12] Suffice it to say, were it otherwise, there would be "no limitation on the number of potential non[-]parties that a trial court would be required to include on the verdict form for purposes of assessing fault under OCGA § 51-12-33 (c)."[13]

The Supreme Court of Georgia has held that under OCGA § 51-12-33 (c), a person or entity who has contributed to the alleged injury or damages means "all persons or entities who have breached a legal duty in tort that is owed with respect to the plaintiff, the breach of which is a proximate cause of the injury sustained by the

---

[11] *Quinney,* 347 Ga. App. at 427 (4) (punctuation omitted); *accord Martin v. Six Flags Over Georgia II, L.P.*, 301 Ga. 323, 337 (III) (801 SE2d 24) (2017); *Couch v. Red Roof Inns, Inc.*, 291 Ga. 359, 362 (1) (729 SE2d 378) (2012).

[12] *Quinney,* 347 Ga. App. at 427 (4) (punctuation omitted); *accord Union Carbide Corp. v. Fields*, 315 Ga. App. 554, 559 (1) (b) (ii) (726 SE2d 521) (2012), *reversed in part on other grounds Georgia-Pac., LLC v. Fields*, 293 Ga. 499 (748 SE2d 407) (2013).

[13] *Quinney,* 347 Ga. App. at 427 (4) (punctuation omitted); *accord Fields*, 315 Ga. App. at 559 (1) (b) (ii) n.4.

7

plaintiff."[14] And that includes not only the plaintiff and defendants with liability to the plaintiff, but also "every other *tortfeasor* whose *commission of a tort* as against the plaintiff was a proximate cause of his injury, regardless of whether such *tortfeasor* would have actual liability in tort to the plaintiff."[15] Finally, while it is the defendant's burden to establish a "rational basis for apportioning fault to a non-party, whether the non-party contributed to the alleged injury is a question of fact for a jury to decide."[16] So, because the appellants alleged that the non-party tortfeasors—*i.e.*, Ron's treating physicians—committed the tort of medical malpractice, they can only be included on the verdict form for purposes of apportionment if there is some competent evidence

---

[14] *Zaldivar v. State*, 297 Ga. 589, 600 (1) (774 SE2d 688) (2015) (punctuation omitted); *accord Johnson St. Props., LLC v. Clure*, 302 Ga. 51, 58 (1) (b) (805 SE2d 60) (2017); *Alston & Bird LLP v. Hatcher Mgmt. Holdings, LLC*, 336 Ga. App. 527, 530 (785 SE2d 541) (2016).

[15] *Zalvidar*, 297 Ga. at 600 (1) (punctuation omitted) (emphasis supplied); *accord Alston & Bird LLP*, 336 Ga. App. at 530; *see Zalvidar*, 297 Ga. at 598 (1) ("[T]he apportionment statute permits consideration, generally speaking, of the 'fault' of a tortfeasor, notwithstanding that he may have a meritorious affirmative defense or claim of immunity against any liability to the plaintiff.").

[16] *Clure*, 302 Ga. at 58 (1) (b); *see Six Flags Over Ga. II, L.P. v. Martin*, 335 Ga. App. 350, 364-65 (3) (780 SE2d 796) (2015) ("[I]t is a defendant's burden to establish a rational basis for apportioning fault to a non[-]party; but whether the defendant meets that burden given the evidence at trial is an issue that should be left to the jury."), *reversed in part on other grounds by Martin v. Six Flags Over Ga. II, L.P.*, 301 Ga. 323 (801 SE2d 24) (2017).

that they did, in fact, commit such malpractice and it proximately caused or contributed to causing Ron's injuries and damages.[17]

(a) *Medical Malpractice.* To recover in a medical-malpractice case, a plaintiff must "show not only a violation of the applicable medical standard of care but also that the purported violation or deviation from the proper standard of care is the proximate cause of the injury sustained."[18] Indeed, a mere showing of negligence

---

[17] *See* note 12 & accompanying text; *Zalvidar*, 297 Ga. at 600 (1) ("[W]e hold that OCGA § 51-12-33 (c) requires the trier of fact in cases to which the statute applies to 'consider the fault of all persons or entities who contributed to the alleged injury or damages,' meaning all persons or entities who have breached a legal duty *in tort* that is owed with respect to the plaintiff, the breach of which is a proximate cause of the injury sustained by the plaintiff. That includes not only the plaintiff himself and defendants with liability to the plaintiff, but also *every other tortfeasor* whose commission of a *tort* as against the plaintiff was a proximate cause of his injury, regardless of whether such tortfeasor would have actual liability in tort to the plaintiff." (emphasis supplied)).

[18] *MCG Health, Inc. v. Barton*, 285 Ga. App. 577, 582 (2) (647 SE2d 81) (2007) (punctuation omitted); *accord Moore v. Singh*, 326 Ga. App. 805, 808 (1) (755 SE2d 319) (2014). In portions of their brief, the appellants suggest that this Court should apply a lesser or different standard than the one that we apply in medical-malpractice cases because this is not a medical-malpractice case against a defendant doctor. This argument is a nonstarter. In *Zalvidar*, our Supreme Court held that OCGA § 51-12-33 (c) "require[s] the trier of fact to consider the 'fault' of a non[-]party only when the non[-]party is *shown to have committed a tort* against the plaintiff that was a proximate cause of his injury." *Zalvidar*, 297 Ga. at 591 (emphasis supplied). The appellants allege that the non-party doctors committed medical malpractice, and thus, we apply our precedent governing such cases.

9

"without proof of causation is insufficient to withstand summary judgment."[19] Additionally, to meet this burden, the plaintiff must "use expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson."[20] Nevertheless, questions regarding causation are "peculiarly questions for the jury except in clear, plain, palpable and undisputed cases."[21]

In Georgia, medical causation must be proved to a "reasonable degree of medical certainty and cannot be based on mere speculation[,]"[22] and the evidence must provide more than a "mere or bare possibility that the alleged negligence caused

[19] *Barton*, 285 Ga. App. at 582 (2) (punctuation omitted); *accord Swint v. Mae*, 340 Ga. App. 480, 482 (1) (798 SE2d 23) (2017); *see Edokpolor v. Grady Mem'l Hosp. Corp.*, 347 Ga. App. 285, 287 (1) (819 SE2d 92) (2018) ("A plaintiff cannot recover for medical malpractice, even [when] there is evidence of negligence, unless the plaintiff establishes by a preponderance of the evidence that the negligence either proximately caused or contributed to cause plaintiff harm." (punctuation omitted)).

[20] *Zalvidar*, 297 Ga. at 500; *accord Edokpolor*, 347 Ga. App. at 287 (1); *Swint*, 340 Ga. App. at 482 (1).

[21] *Barton*, 285 Ga. App. at 582 (2) (punctuation omitted); *accord Adams v. McDonald*, 346 Ga. App. 464, 469 (816 SE2d 454) (2018).

[22] *Barton*, 285 Ga. App. at 582 (2) (punctuation omitted); *accord Knight v. Roberts*, 316 Ga. App. 599, 604 (1) (a) (730 SE2d 78) (2012).

the plaintiff's injury."[23] Indeed, the expert's testimony must show as an evidentiary threshold that "the expert's opinion regarding causation is based, at the least, on the determination that there was a reasonable probability that the negligence caused the injury."[24] Of course, a "reasonable degree of medical certainty," while an acceptable means by which "an expert may express the confidence [he or she] has ken in the conclusion formed and the probability that it is accurate, is not the *required* standard."[25] To the contrary, Georgia law requires only that "an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical certainty."[26]

---

[23] *Zwiren v. Thompson*, 276 Ga. 498, 501 (578 SE2d 862) (2003); *see Moore*, 326 Ga. App. at 809 (1) ("[A] plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough." (punctuation omitted)).

[24] *Zwiren*, 276 Ga. at 501 (punctuation omitted); *accord Swint v. Alphonse*, 348 Ga. App. 199, 206 (2) (820 SE2d 312) (2018).

[25] *Zwiren*, 276 Ga. at 501 (punctuation omitted); *see Moore*, 326 Ga. App. at 810 (1) (holding that the expert's "failure to state that he believed [his opinion] to be the case 'to a reasonable degree of medical certainty' does not require a finding that [the plaintiff] failed to present evidence of causation—[his] experts were not required to use these magic words in rendering their opinions" (punctuation omitted)).

[26] *Zwiren*, 276 Ga. at 501 (punctuation omitted); *see Moore*, 326 Ga. App. 805 at 809 (1) ("In some instances where the question of causation is outside the ken of

11

Turning to the alleged medical malpractice in this case, the appellants submitted an affidavit by Feingold, their proposed expert on Ron's form of lung cancer, alleging that certain negligence by Ron's treating physicians contributed to his pain and suffering and decline in his quality of life. In addition to his affidavit, Feingold issued a report regarding his review of Ron's medical records and treatment. And as to the standard of care for pulmonary adenocarcinoma, Feingold averred that "it is currently routine to submit samples of newly diagnosed pulmonary adenocarcinoma for DNA mutation analysis." According to Feingold, "EGFR-mutated adenocarcinoma . . . are usually susceptible to treatment with a new class of therapeutic agents named tyrosine kinasc inhibitors ("TKIs") and that patients with EGFR mutations often experience dramatic therapeutic response to TKI treatment characterized by resolution or near resolution of pulmonary parenchymal masses and even resolution of mestatic foci."[27] He further averred that in 2014, when Ron was diagnosed with cancer, "the *possibility* of adding TKI to chemotherapy was routinely

_____

the normal juror, this showing must be based on expert testimony that is sufficient to support a finding that the deviation from the standard of care to a reasonable degree of medical certainty caused the injury.").

[27] (Brackets omitted).

12

*considered* by oncologists and pulmonologists . . . who were treating patients with EGFR-mutated lung cancers."[28]

As a caveat to his opinion, Feingold noted that the medical records available to him in this case were incomplete.[29] But a review of the records that were available to him at that time suggested Ron "was not treated with a TKI (if at all) until at least two years after his original diagnosis[,] . . . but instead was treated with traditional chemotherapy." So, Feingold could tell from Ron's records that a DNA-mutation analysis was not performed on his tumor until December 2016—two years after his diagnosis. And according to Feingold, when this testing was performed, it revealed a treatable EGFR mutation. Feingold noted that, initially, he could not determine from the records available to him whether or when Ron was treated with TKIs. But he later explained that Ron received TKI treatments in late 2016 or early 2017.

---

[28] (Emphasis supplied).

[29] Feingold averred that, at the time of his report, the medical records available to him were incomplete, and while he received additional records by the time he executed his affidavit, the records were "still incomplete." In their briefs, neither party provides an explanation for why Feingold lacked access to Ron's complete medical records, and the appellants have not raised any arguments on appeal regarding that issue.

According to Feingold's report, Ron had a CT Scan on November 25, 2016, and after receiving additional medical records, Feingold was able to confirm that Ron received a TKI treatment in the six months following that scan. Feingold's report further noted that on May 24, 2017, Ron had another CT scan; and while Feingold did not have access to a copy of that scan, it "*reportedly* revealed significant improvement[,] which *implies* that at some point in the six months after the CT of 11/25/2016[,] [Ron] was finally treated with a TKI for his EGFR mutated adenocarcinoma."[30] But then, after receiving a report from another doctor, Feingold was able to confirm that Ron had been treated with a TKI following his November 25, 2016 CT scan, but before his May 24, 2017 CT scan, which Feingold still did not have a copy of for his records. In sum, Feingold concluded that "the more than two-year delay in the identification and proper treatment of [Ron's] EGFR mutation deprived him of the potential benefits of early TKI treatment and probably meaningfully contributed to his pain and suffering and a decrease in his quality of life during the period after November 2014 until his death." Nevertheless, Feingold maintained that he still did not have a complete copy of Ron's medical records, and

---

[30] (Emphasis supplied).

14

he reserved the right to "supplement [his] opinion upon receipt of additional materials."

In providing an opinion in a medical-malpractice case, an expert need not use the magic words "reasonable degree of medical certainty," but the facts in the record "must be sufficient to meet the legal standard embodied in those 'magic words.'"[31] Nevertheless, in presenting an opinion on causation, the expert is "required to express some basis for both the confidence with which his conclusion is formed, and the probability that his conclusion is accurate."[32] Put another way, there must be a "realistic assessment of the likelihood that the alleged negligence caused the injury or death."[33] Indeed, perhaps nothing in medicine is absolutely certain, but "the law

---

[31] *Beasley v. Northside Hosp., Inc.*, 289 Ga. App. 685, 689 (658 SE2d 233) (2008) (footnote omitted); *see Swint*, 340 Ga. App. at 482 (1) (explaining that an expert in a medical-malpractice action "must state his or her opinion regarding proximate causation in terms stronger than that of medical possibility[,] . . .[but] [t]he use of the magic words 'reasonable degree of medical certainty' is not required . . . ." (citation omitted)).

[32] *Swint*, 340 Ga. App. at 483 (1) (punctuation omitted)); *accord Zwiren*, 276 Ga. at 501; *Ga. Clinic, P.C. v. Stout*, 323 Ga. App. 487, 495 (5) (747 SE2d 83) (2013); *Beasley*, 289 Ga. App. at 688.

[33] *Anthony v. Chambless*, 231 Ga. App. 657, 659 (1) (500 SE2d 402) (1998) (punctuation omitted); *see Zwiren*, 276 Ga. at 500-01 ("Using the specialized knowledge and training of his field, the expert's role is to present to the jury a realistic assessment of the likelihood that the defendant's alleged negligence caused

15

intends that if the plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment."[34]

Applying these well-established principles in this case, we conclude that Feingold's medical testimony was simply too vague to express the kind of reasonable degree of medical certainty or probability necessary to establish causation for a medical-malpractice claim. Significantly, Feingold admits that he never had Ron's complete medical records, and he reserved the right to supplement his opinion if more records were received, which suggests that the opinion expressed in his affidavit might not even be final. Feingold also averred that in 2014, when Ron was diagnosed with lung cancer, "the possibility of adding TKI treatments to chemotherapy was routinely considered by oncologists and pulmonologists . . . who were treating patients with EGFR-mutated lung cancers." Needless to say, testimony that cancer specialists only *considered* the *possibility* of administering TKI treatments in addition

_____

the plaintiff's injury.").

[34] *Beasley*, 289 Ga. App. at 688; *accord Zwiren*, 276 Ga. at 501; *Naik v. Booker*, 303 Ga. App. 282, 285 (692 SE2d 855) (2010).

16

to chemotherapy when a patient has a EGFR mutation does not indicate how often TKI treatments were actually *administered* in such cases.

And while Feingold's report indicated that Ron received TKI treatments in the six months following his November 2016 CT scan, Feingold never saw the CT scan that was allegedly taken six months *after* the treatments, and thus, he had no first-hand knowledge of whether the treatment even benefitted Ron or how it was beneficial. Moreover, Feingold never specified the type of pain and suffering the TKI treatments would have reduced or the percentage of likelihood that they would have reduced such pain,[35] and he certainly did not claim that TKI treatments could have prevented Ron's death. Simply put, Feingold's summary conclusion that the "delay in the identification and proper treatment of [Ron's] EGFR mutation deprived him of

---

[35] In their reply brief, the appellants detail the pain and suffering Ron endured as a result of chemotherapy and later refer to it as the "wrong treatment," but Feingold never asserted that TKI treatments were a *replacement* for chemotherapy. To the contrary, Feingold averred that cancer specialists routinely considered the possibility of *adding* such treatments to chemotherapy, and he never claimed that TKI treatments lessened the well-known adverse effects of chemotherapy. The appellants also claim that Feingold averred that Ron's medical records "revealed significant improvement" shortly after his doctor's began the TKI treatment. But again, Feingold never actually viewed the CT scan that was taken after Ron allegedly received TKI treatments and averred only that the scan *reportedly* revealed significant improvement. Feingold provided no first-hand testimony regarding whether this latest CT scan revealed any improvement at all.

the *potential* benefits of early TKI treatment and *probably meaningfully* contributed to his pain and suffering and a decrease in his quality of life . . ."[36] fails to "express some basis for *both* the *confidence* with which his conclusion is formed, and the *probability* that his conclusion is accurate."[37]

---

[36] (Emphasis supplied).

[37] *Zwiren*, 276 Ga. at 501 (punctuation omitted) (emphasis supplied); *see Edokpolor*, 347 Ga. App. at 287-88 (1) (holding that a medical expert's conclusion, with little explanation, that the hospital's nursing staff's negligent decision to administer medication by mouth rather than through an NG tube proximately caused the patient's death by aspiration did not raise a genuine issue of material fact as to the causation requirement); *Beasley*, 289 Ga. App. at 689-90 (affirming the trial court's grant of summary judgment to the defendant hospital in a medical-malpractice case when the plaintiff's expert's opinion included "no assessment of the likelihood that the hospital's alleged negligence caused [the plaintiff's] injuries, no basis for the expert's conclusion, and no expression of probability that the expert's conclusion is accurate[,]" and the plaintiff's "medical expert could not form an opinion with sufficient certainty so as to make a medical judgment"); *Reeves v. Mahathre*, 328 Ga. App. 546, 550 (759 SE2d 926) (2014) ("Although one of [a]ppellants' experts . . . opined generally that the failure of [the defendant doctor], among various other medical professionals, to correctly diagnose [the deceased] and relieve the obstruction 'ultimately led to the development of urosepsis and caused her death,' this generalized testimony was not sufficient to create a jury question on the issue of causation." (punctuation and emphasis omitted)); *Cannon v. Jeffries*, 250 Ga. App. 371, 373 (1) (551 SE2d 777) (2001) (affirming grant of summary judgment for defendant doctor on causation when expert testimony established that the defendant's actions "may have contributed" to the decedent's injury and "was unwilling to state a *percentage of probability*" (emphasis supplied)); *Estate of Patterson v. Fulton-DeKalb Hosp. Auth.*, 233 Ga. App. 706, 709 (2) (505 SE2d 232) (1998) (holding expert testimony that the doctor's alleged negligence "may have contributed" to the decedent's injury and death was insufficient to establish causation

18

Thus, the appellants failed to present competent evidence to show that Ron's doctors were "tortfeasors" who committed malpractice, and thus, the trial court did not err in finding that they should not be included on the verdict form for apportionment of fault.[38]

(b) *Feingold's qualifications.* The parties disagree as to whether Feingold is qualified to testify as an expert regarding the alleged medical malpractice. Further, the appellants challenge the trial court's finding that their non-party fault defense fails

---

for a medical-malpractice claim); *Grantham v. Amin*, 221 Ga. App. 458, 458-59 (471 SE2d 525) (1996) (affirming summary judgment in favor of the defendant doctor when the plaintiff's expert testified that the doctor's alleged negligence "could have been a significant contributing cause" to the patient's death); *see also Edokpolor*, 347 Ga. App. at 287 (1) (explaining that "[t]here can be no recovery where there is no showing to any reasonable degree of medical certainty that the injuries could have been avoided" (punctuation omitted)). *Cf. Swint*, 348 Ga. App. at 207 (2) (reversing the trial court's grant of summary judgment to the defendant doctor when the plaintiff's expert testified that, in his professional opinion, there was a "high probability" that the defendant doctor's breach of the standard of care caused the plaintiff's injuries). In its reply brief, the appellants argue that Long waived her argument that Feingold's testimony was unsupported by "facts and data" because she raises it for the first time on appeal. But they concede that Long *did* argue below that Feingold's opinion did not meet the reasonable-degree-of-medical-certainty requirement. And as explained *supra*, we agree with the latter argument. Needless to say, a grant of summary judgment must be affirmed "if it is right for any reason, whether stated or unstated in the trial court's order, so long as the movant raised the issue in the trial court and the nonmovant had a fair opportunity to respond." *Georgia-Pac., LLC*, 293 Ga. at 504 (punctuation and emphasis omitted).

[38] *See supra* notes 12 and 15 & accompanying text.

19

because any medical malpractice resulting from Ron's lung cancer was foreseeable to them. But because we hold in Division (1) (a) *supra* that Feingold's testimony was insufficient to establish the causation element of a medical-malpractice claim against Ron's physicians for purposes of apportionment, we need not separately address the trial court's other alternative bases for granting summary judgment as to the appellants' non-party fault defense.

2. Next, the appellants argues that the trial court erred in granting summary judgment on "alternative carcinogens." But, in substance, their arguments relate to matters that were not actually ruled upon by the trial court, which leaves us with nothing to review.

Because there seems to be some confusion among the parties as to what exactly the trial court granted summary judgment on with respect to alternative carcinogens, it is helpful to briefly review the procedural history of that claim.

In moving for summary judgment, Long alleged that, during discovery, the appellants attempted to "assign liability" for Ron's lung cancer to his exposure to alternative carcinogens, such as second-hand smoke, radon, and diesel exhaust. Specifically, Long claimed that "[i]n the *apportionment of liability*,"[39] the appellants

---

[39](Emphasis supplied).

bear the same burden that she does in assigning liability,[40] and they cannot prove that Ron had exposure to any of those substances. Then, in the argument section of Long's summary-judgment motion, she contended that, as to alternative carcinogens, the appellants "must present actual evidence that a *non-party was at fault.*"[41] But Long also argued that, alternatively, if the trial court found that she was not entitled to summary judgment, it should exclude any evidence that Ron was exposed to alternative carcinogens under OCGA § 24-4-403 ("Rule 403").[42]

In their response, the appellants explained that Long "mistakenly" believed that they sought "to 'assign liability' to these alternative exposures . . . ." Indeed, they claim that Long simply misunderstood their intentions. Nevertheless, the appellants

---

[40] (Emphasis supplied). Although Long sought summary judgment as to any attempt by the appellants to apportion fault with regard to alternative carcinogens, she has never identified the specific non-party or parties to which she believed the appellants might seek to allocate fault. Regardless, according to the appellants, they have no intention of doing so.

[41] (Emphasis supplied).

[42] *See* OCGA § 24-4-403 ("Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). In its order, the trial court granted Long's request for summary judgment, so it did not also address this "alternative" evidentiary request or engage in any Rule 403 analysis with respect to it.

21

argued that it was *Long's* burden to prove causation as an essential element of her toxic-tort claim. And after further discussing Long's burden of proof, the appellants contended that they are "entitled to show the jury through *cross-examination* of [Long's] experts that those experts failed to investigate and appropriately rule out alternative causes of [Ron's] injury and death."[43] Lastly, the appellants contended that any ruling to exclude all evidence of alternative carcinogens was premature, as discovery was still ongoing and responses to certain pre-trial motions were not yet due.

In her reply, disregarding the appellants' clarification that they were *not* intending to present evidence of alternative carcinogens for purposes of assigning liability to a non-party, Long reiterated her argument that, as to alternative carcinogens, the appellants must satisfy the requirements of the apportionment statute and present "actual evidence that [a] non-party was at fault." Long also reasserted her

---

[43] (Emphasis supplied). While the appellants argue that they should be allowed to present evidence of Ron's exposure to alternative carcinogens in their case-in-chief *and* through cross-examination, their response to Long's motion for summary judgment indicated that they only intended to present evidence of alternative carcinogens during cross-examination. Regardless, the trial court did not rule on those evidentiary matters.

claim that, alternatively, the court should exclude evidence of alternative carcinogens because it had the potential to mislead or prejudice the jury.

In the trial court's four-sentence ruling related to alternative carcinogens, it addressed the sole issue for which Long sought summary judgment—her claim that the appellants failed to present sufficient evidence to satisfy the causation requirement of the apportionment statute. Specifically, in its summary ruling, the court agreed with Long, citing only OCGA § 51-12-33 (c) and a case that addresses a trial court's rulings on apportionment issues.[44] Presumably, because the court found that Long *was* entitled to summary judgment, it did not address her alternative evidentiary arguments.

Turning to this appeal, the appellants explain, yet again, that they "do *not* seek to apportion fault to any non[-]party with respect to these alternative carcinogens."[45] So, the appellants present no arguments that challenge the trial court's *apportionment*

---

[44] *See Union Carbide Corp.*, 315 Ga. App. at 556 (1).

[45] In their reply brief, the appellants note that, "[c]iting to the non[-]party fault statute (OCGA § 51-12-33) and case law applying that statute, [Long] convinced the trial court to grant 'summary judgment on alternative carcinogens' because [they] did not have an expert opinion that those carcinogens were causative of [Ron's] cancer." And yet again, the appellants maintain, as they have throughout this entire litigation, that they "never sought to allocate fault to a non[-]party with respect to any alternative carcinogens."

23

ruling as to alternative carcinogens, and as a result, they have affirmatively abandoned any such challenge on appeal.[46] Nevertheless, the appellants maintain that the trial court erred in "granting summary judgment on 'alternative carcinogens.'" Then, the appellants argue that they should be permitted to present evidence of alternative potential causes for Ron's lung cancer during its case-in-chief and through cross-examination of Long's experts. But despite the parties' lengthy arguments as to the admissibility of this evidence for purposes *other* than apportionment, their arguments bear no relation to the order being appealed.[47]

As we have repeatedly explained, this is a Court for the correction of errors of law, and "if the trial court has not ruled on an issue, we will not address it."[48] Indeed,

---

[46] *See Clack v. Hasnat*, 354 Ga. App. 502, 506 (2) (b) (841 SE2d 210) (2020)("[T]he plaintiffs do not present any meaningful argument in support of such a claim and have therefore abandoned it."); *Gunn v. State*, 342 Ga. App. 615, 623-24 (3) (804 SE2d 118) (2017) ("[U]nder the rules of this Court, an appellant must support enumerations of error with argument and citation of authority, and mere conclusory statements are not the type of meaningful argument contemplated by our rules." (punctuation and footnote omitted)).

[47] In its opening brief, the appellants acknowledge that "[t]he *only* reason the trial court gave in its order is that [it] did not have an expert opinion that exposure to these alternative carcinogens was 'causative' of [Ron's] cancer and that [it] therefore could not meet their burden of proving non[-]party fault under OCGA § 51-12-33."

[48] *Zywiciel v. Historic Westside Vill. Partners, LLC*, 313 Ga. App. 397, 402 (5) (721 SE2d 617) (2011); *see Mordica v. State*, 319 Ga. App. 149, 154-55 (2) (736

24

without a ruling by the trial court on a particular issue, there is "nothing for this Court to review upon appeal."[49] Here, as evidenced *supra*, Long's motion for summary judgment as to alternative carcinogens was based solely on preventing the appellants from pursuing an apportionment defense, and the appellants acknowledge that the trial court's sole basis for granting summary judgment was their failure to meet the causation requirement of the apportionment statute. And while they never had any intention of seeking to apportion fault with respect to alternative carcinogens, the trial court granted *Long's* motion for partial summary judgment, which alleged that the appellants did so. Simply put, the court's order involved the grant of summary judgment on an apportionment defense, not any evidentiary rulings unrelated to apportionment, which makes sense if, as the appellants contend, discovery is not over

---

SE2d 153) (2012) (explaining that it is well settled that "this [C]ourt may not address issues on appeal which were not addressed by the trial court, because this [C]ourt is a court for the correction of errors and it does not consider matters which were not raised and ruled on by the trial court." (punctuation omitted)); *Morman-Johnson v. Hathaway*, 312 Ga. App. 300, 301 (1) (718 SE2d 132) (2011) (same).

[49] *Mordica*, 319 Ga. App. at 155 (2); *see Nichols v. State*, 285 Ga. 784, 785 (2) (a) (683 SE2d 610) (2009) ("The trial court did not rule on the issue which [the appellant] raises on appeal. In the absence of any ruling by the trial court on this issue, there is nothing for this Court to review." (punctuation omitted)); *Willingham v. Willingham*, 261 Ga. 674, 674 (2) (410 SE2d 98) (1991) ("[S]ince appellee secured no ruling by the trial court on this question, nothing is presented for our review.").

25

and responses to motions in limine are not yet due.[50] Thus, the appellants' claims of

---

[50] Apportionment is an affirmative defense that is subject to summary judgment. *See Clure*, 302 Ga. at 58 (1) (b) (reversing the trial court's grant of partial summary judgment as to apportionment of fault); *Guzman v. Link*, 354 Ga. App. 463, 464 n.3 (841 SE2d 203) (2020) (characterizing a party's apportionment request as an affirmative defense); *Brown v. Tucker*, 337 Ga. App. 704, 716 (4) (788 SE2d 810) (2016) ("The affirmative defense that the jury should apportion fault against someone other than the defendant is no different analytically from the defense of contributory negligence. Once the plaintiff establishes her prima facie case, the defendant seeking to establish that someone else bears responsibility for the damages has the burden of proving that defense."); *Levine v. Suntrust Robinson Humphrey*, 321 Ga. App. 268, 271 (1) (740 SE2d 672) (2013) (reversing the grant of summary judgment with respect to an apportionment claim). On the other hand, purely evidentiary matters, such as whether the alternative-carcinogens evidence is admissible for purposes unrelated to apportionment, are generally handled through a motion in limine or at trial. Indeed, our Supreme Court has explained that "[a] motion in limine is a pretrial method of determining the admissibility of evidence, as a party may secure a pretrial ruling on the admissibility of evidence or a ruling prohibiting any reference to certain evidence until its admissibility can be assessed in the context of the trial as it unfolds." *Andrews v. Wilbanks*, 265 Ga. 555, 556 (458 SE2d 817) (1995); *accord Dep't of Tra nsp. v. Wallace Enters*, 234 Ga. App. 1, 5 (6) (505 SE2d 549) (1998); *see Miller v. Lynch*, 351 Ga. App. 361, 368 (3) (830 SE2d 749) (2019) ("If the trial court decides to rule on the admissibility of evidence prior to trial, the court's determination of the admissibility is similar to a preliminary ruling on evidence at a pretrial conference and it controls the subsequent course of action." (punctuation omitted)); *Mark v. Agerter*, 332 Ga. App. 879, 879 (775 SE2d 235) (2015) ("Because a motion in limine is a pretrial determination of the admissibility of evidence, the grant of a motion in limine excluding evidence is a judicial power which must be exercised with great care.").

26

error relate to purely evidentiary matters that have not yet been resolved by the trial court, and under such circumstances, they present no error for this Court to review.[51]

For all these reasons, we affirm the trial court's grant of partial summary judgment to Long.

*Judgment affirmed. Rickman and Brown, JJ., concur.*

---

[51] *See supra* notes 48-49 & accompanying text.